## PANHANDLE EASTERN PIPE LINE CO. et al. v. FEDERAL POWER COMMISSION et al.

### No. 12466.

Circuit Court of Appeals, Eighth Circuit.

June 6, 1944.

490

RIDDICK, Circuit Judge, dissenting.

———◆———

D. H. Culton, of Amarillo, Tex., Robert J. Bulkley, of Washington, D. C., Arthur G. Logan, of Wilmington, Del., and John S. L. Yost, of Washington, D. C. (Glenn W. Clark, of Kansas City, Mo., and Ira Lloyd Letts, of Providence, R.I., on the briefs), for petitioners.

Harry S. Littman, Asst. Gen. Counsel, Federal Power Commission, of Washington, D. C., and Harold Goodman, Sp. Asst. Pros. Atty., of Detroit, Mich., County of Wayne, Michigan (Charles V. Shannon, Gen. Counsel, Federal Power Commission, and Robert L. Russell, Atty., Federal Power Commission, both of Washington, D. C., Paul E. Krause, Corporation Counsel, James H. Lee, Asst. Corp. Counsel, City of Detroit, Mich., and William E. Dowling, Pros. Atty., County of Wayne, Mich., all of Detroit, Mich., and Park Chamberlain, of Philadelphia, Pa., and Henry A. Montgomery and A. V. McRee, both of Detroit, Mich., on the briefs), for respondents.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

SANBORN, Circuit Judge.

The petitioners, pursuant to § 19(b) of the Natural Gas Act,[1] seek a review and reversal of an interim rate reduction order made by the Federal Power Commission on September 23, 1942. The case was argued and submitted at the May, 1943, term of this Court. Decision was deferred awaiting the determination by the Supreme Court of the United States of the cases of Federal Power Commission et al. v. Hope Natural Gas Company, and City of Cleveland v. Hope Natural Gas Company. After the opinion in those cases was rendered (January 3, 1944, 320 U.S. 591, 64 S.Ct. 281), a resubmission of the instant case at the March, 1944, term of this Court, upon supplemental briefs and a reargument, was ordered, so that we might have the benefit of the views of counsel as to the impact of the opinion of the Supreme Court in the Hope Natural Gas Company cases upon the questions here involved.

The petitioners are Panhandle Eastern Pipe Line Company and its wholly owned subsidiaries, Illinois Natural Gas Company and Michigan Gas Transmission Corporation. Their separate holdings constitute a single system for the gathering, transportation, and sale of natural gas, and appropriately may be regarded and referred to as though jointly owned and operated by the petitioners. The respondents are Federal Power Commission, City of Detroit, Michigan, County of Wayne, Michigan, Michigan Consolidated Gas Company, and Michigan Public Service Commission.

The petitioners gather, through production and purchase, natural gas in the Amarillo gas field of the Texas Panhandle and in the Hugoton gas field in southwestern Kansas. This gas is transported to markets through a main transmission pipeline which extends for a distance of about 860 miles from a point in Moore County, Texas, across the states of Oklahoma, Kansas, Missouri and Illinois, to a point near Dana, Indiana, close to the Illinois-Indiana boundary, where the line connects with a transmission pipeline extending from Dana, Indiana, to a point near Zionsville, Indiana, where the line branches. One branch runs to Detroit, Michigan, and the other to Muncie, In-

---

[1] Act of June 21, 1938, c. 556, 52 Stat. 821, 831, 15 U.S.C.A. § 717r(b).

diana. Lateral pipelines extend 'from petitioners' main transmission line in Illinois. Through their system of pipelines, natural gas is marketed by the petitioners, mainly for resale, in Texas, Kansas, Missouri, Illinois, Indiana, Michigan and Ohio. The petitioners serve more than 200 communities and upwards of 700,000 consumers of gas and have the longest natural gas pipeline in existence.

On February 28, 1941, the City of Detroit and the County of Wayne, Michigan, filed a petition with the Federal Power Commission, asserting that the rates and charges of petitioners Panhandle Eastern Pipe Line Company and Michigan Gas Transmission Corporation for natural gas sold to Michigan Consolidated Gas Company, for resale in that City and County, were unjust, unreasonable and unduly discriminatory. On May 22, 1941, the Commission, of its own motion, instituted an investigation of the wholesale rates and charges of those two petitioners for natural gas. The investigation was later enlarged to include the Illinois Natural Gas Company. The two proceedings before the Commission, known as Docket No. G-200 and Docket No. G-207, were consolidated for hearing. The Michigan Consolidated Gas Company and the Michigan Public Service Commission were permitted to intervene. The hearing was begun on July 15, 1941, before a trial examiner, and continued from time to time thereafter until April 23, 1942. More than 10,000 pages of testimony was taken, and more than 250 exhibits were received in evidence.[2]

On April 23, 1942, the trial examiner adjourned the hearing pending the disposition of motions filed by counsel for the Federal Power Commission and by the City of Detroit, the County of Wayne, and Michigan Consolidated Gas Company for an interim order directing a reduction of petitioners' rates pending further hearing

and investigation. It appears that the complainants before the Commission were contending that petitioners' rates should immediately be reduced by $6,800,479 per annum, and that counsel for the Commission and the Michigan Consolidated Gas Company were urging a rate reduction of approximately $5,500,000 per annum.

The Commission filed its opinion on September 23, 1942. It took the year 1941 as the appropriate test period. It found that the "Actual Cost of Gas Plant in Service at December 31, 1941," was $78,814,292; that accrued depreciation was $12,596,987; that the actual cost less accrued depreciation was $66,217,305. To this amount the Commission added $920,000 for working capital; and this produced a rate base of $67,137,305. The Commission determined that a fair annual rate of return was $6\frac{1}{2}\%$ of that amount, or $4,363,925; that the net operating revenue of petitioners for 1941 ("Available for Return") was $9,458,309, which was $5,094,384 in excess of the return found by the Commission to be reasonable. The Commission concluded that to that extent the rates and charges of petitioners were unjust, unreasonable, unlawful, and violative of the provisions of the Natural Gas Act. The order of the Commission, filed September 23, 1942, required that: "The rates and charges made, demanded, or received by the respondents [petitioners here] for or in connection with their transportation and sale of natural gas in interstate commerce for resale for ultimate public consumption shall be so reduced as to reflect, when applied to respondents' [petitioners'] 1941 transportation and sales, a reduction of not less than $5,094,384 per annum below their 1941 consolidated gross operating revenues of $17,789,573; * * *."

The petitioners contend that the order of the Commission is invalid because: (1) The trial examiner excluded relevant and

---

[2] In describing the hearing, the Commission in its opinion states:

"The complainants [City of Detroit and County of Wayne, Michigan] offered one witness in support of their petition. The respondents [petitioners in this Court] offered 24 witnesses who presented a complete rate case including, among other matters, evidence of operations, revenues, expenses, book cost and original cost of their properties, 'going concern value,' working capital, gas reserves, depreciation, rate of return, future capital expenditures and allocation

of costs. Counsel for the Commission called 5 witnesses whose testimony related principally to depreciation, a write-up, historical earnings on average net investment, working capital, rate of return, and allocation of costs. The interveners [Michigan Public Service Commission and Michigan Consolidated Gas Company] presented no witnesses. The witnesses were tendered to all parties for cross-examination and full opportunity was given to present rebuttal evidence."

material evidence of the value of their property; (2) the Commission erred in assuming jurisdiction over the petitioners' production and gathering of natural gas; (3) the Commission erred in assuming jurisdiction over the petitioners' revenues from direct sales of gas to customers for their own use; (4) the return allowed by the Commission is unjust, unreasonable and confiscatory.

These contentions will be considered in their order.

1. The petitioners state that the evidence offered by them and rejected by the trial examiner showed that the present reproduction or replacement cost of Panhandle Eastern's physical properties as of June 30, 1941, less observed and determined depreciation, was $7,892,174 greater than original cost less book reserves; that the present reproduction cost of the physical properties of the Michigan Gas Transmission Corporation, similarly ascertained, was $2,933,808 in excess of actual cost less book reserves; and that Panhandle Eastern's leaseholds have a present market value $7,384,626 greater than the net investment therein as shown by its books. The rejected evidence tended to establish a reproduction cost or replacement value, less observed depreciation, for all of the petitioners' property of $83,957,083.

The ruling of the trial examiner excluding this evidence was approved by the Commission in its opinion of September 23, 1942. The reasons given by the Commission for its approval of the exclusion of the evidence of reproduction cost are, in substance: that § 6(a) of the Natural Gas Act, 15 U.S.C.A. § 717e(a), provides that "The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property"; that there is no need for estimating the cost of petitioners' property; that petitioners' cost records are accurate, complete and properly maintained; that their plant was constructed in recent years and there is no difficulty in ascertaining from petitioners' books the actual legitimate cost of or investment in their property; that the Commission has held that reproduction cost evidence is inherently fallacious and should be disregarded under the statute; that the defects of such evidence have been pointed out by the Supreme Court of the United States; that it seems evident that Congress recognized the fallacy of the reproduction cost doctrine and sought by the enactment of § 6(a) to do away with that concept of rate-making; that the Supreme Court, in Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037, said: "The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances"; that, in a concurring opinion in that case, Justices Black, Douglas, and Murphy said (page 606 of 315 U.S., page 752 of 62 S.Ct., 86 L.Ed. 1037): "As we read the opinion of the Court, the Commission is now freed from the compulsion of admitting evidence on reproduction cost or of giving any weight to that element of 'fair value'. The Commission may now adopt, if it chooses, prudent investment as a rate base—the base long advocated by Mr. Justice Brandeis. And for the reasons stated by Mr. Justice Brandeis in the Southwestern Bell Telephone case [Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807], there could be no constitutional objection if the Commission adhered to that formula and rejected all others"; that the Commission has been authorized by Congress to determine in the first instance the actual legitimate cost of utility properties and the depreciation therein; that the rate base is such cost less existing depreciation, plus necessary working capital; that it is certain from the record that no necessity exists requiring consideration of other facts in determining a rate base in these proceedings.

The petitioners assert that the power granted to the Commission under the Natural Gas Act to reduce rates can be exercised only if the Commission, after a full and fair hearing, shall determine that existing rates are unjust, unreasonable, unduly discriminatory or preferential, § 5(a) of the Act; 15 U.S.C.A. § 717d(a); that the duties of the Commission are of a quasi judicial character; that it must receive and consider any evidence that might or could be determined by a fair-minded person to

be material in reaching a determination of the ultimate fact, namely, a fair price for the commodity sold or the service rendered; that, in determining the just and reasonable return to be allowed, any and all evidence which is relevant must first be admitted and considered.

Apparently no court has as yet ruled that the Federal Power Commission may, in a rate hearing, refuse to receive and consider evidence of replacement or reproduction cost of the properties of a company subject to the Natural Gas Act. It was held, in effect, in the case of Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 606, 607, 62 S.Ct. 736, 86 L.Ed. 1037, and in the Hope Natural Gas Company cases, 320 U.S. 591, 602-605, 64 S.Ct. 281, that the Commission was not bound to give weight to such evidence in determining rates.

Nevertheless, the question whether the refusal of the Commission to receive the evidence of reproduction or replacement cost or value offered by the petitioners amounted to a denial of due process is not free from doubt. That § 6(a) of the Natural Gas Act authorizes the Commission to reject evidence which it regards as not "necessary for rate-making purposes" is questionable. There is little to indicate that Congress, in enacting § 6(a), intended to change the law of evidence. That section apparently relates to the investigation and ascertainment by the Commission of material facts relevant to the question of "fair value", and probably has no controlling effect upon the admissibility of evidence at a rate hearing.

In Donnelly Garment Co. v. National Labor Relations Board, 8 Cir., 123 F.2d 215, 224, this Court said: "That a refusal by an administrative agency such as the National Labor Relations Board to receive and consider competent and material evidence offered by a party to a proceeding before it, amounts to a denial of due process is not open to debate."

And: " * * * That the Board would or might have reached no different conclusion had the rejected evidence been received, is entirely beside the point. The truth is that a controversy tried before a court or before an administrative agency is not ripe for decision until all competent and material evidence proffered by the parties has been received and considered."

This is a correct statement of the law. The respondents do not contend to the con-

trary, but deny the applicability of the rule in the instant case. The evidence rejected in the Donnelly Garment Company case was competent, relevant and material. It bore directly upon the issue being tried by the National Labor Relations Board, namely, whether an independent union of the employees of the Donnelly Garment Company was company dominated or not. The basis for rejecting the evidence in that case was, in substance, that it was not worthy of belief and would not be credited.

The case of Pittsburgh Plate Glass Co. v. National Labor Relations Board, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251, indicates that the rejection of relevant evidence by an administrative agency does not always constitute a denial of due process. In that case the question before the Board was whether all of the employees at all of the plants of the Glass Company constituted an appropriate unit for collective bargaining or whether the employees at the Crystal City plant of the company, who had an independent union of their own and wanted to have their own bargaining representative, should be considered a separate unit. The Board determined to disregard the wishes of the employees at the Crystal City plant, and excluded evidence thereof. The Board had a wide discretion with respect to the selection of the appropriate unit for the purposes of collective bargaining. The Glass Company contended that, in rejecting relevant evidence as to the wishes and situation of the employees at the Crystal City plant, the Board had denied a fair hearing. This Court, on review of the Board's order, thought that, under the circumstances of that case, the rejection of the evidence did not amount to a denial of due process. (Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 703.) The Supreme Court affirmed, saying (page 163 of 313 U.S., page 917 of 61 S.Ct., 85 L.Ed. 1251): "Further, if we consider all the contentions about exclusion of evidence together instead of separately, we do not find that in the aggregate the evidence excluded could have materially affected the outcome on the 'appropriate unit' issue, in the light of the criteria by which the Board determined that issue."

Mr. Justice Stone, in expressing his dissent and that of Mr. Chief Justice Hughes and Mr. Justice Roberts, said in conclusion (page 177 of 313 U.S., page 923 of 61 S.Ct., 85 L.Ed. 1251): "One of the most import-

ant safeguards of the rights of litigants and the minimal constitutional requirement, in proceedings before an administrative agency vested with discretion is that it cannot rightly exclude from consideration, facts and circumstances relevant to its inquiry which upon due consideration may be of persuasive weight in the exercise of its discretion. Interstate Commerce Commission v. Chicago, R. I. & P. Ry. Co., 218 U.S. 88, 102, 30 S.Ct. 651, 656, 54 L.Ed. 946; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 75, 78, 56 S.Ct. 720, 736, 737, 80 L.Ed. 1033; Ohio Bell Telephone Co. v. Commission, 301 U.S. 292, 304, 305, 57 S.Ct. 724, 730, 81 L.Ed. 1093."

■ The majority opinion of the Supreme Court in the Pittsburgh Plate Glass Company case indicates that where an administrative agency has authority to choose the criteria determinative of an issue of fact, it may reject evidence which has no materiality in view of the criteria adopted, and that, under those circumstances, the rejection of such evidence is not a denial of due process.

■ The Federal Power Commission is not bound "to the service of any single formula or combination of formulas" (Federal Power Commission v. Natural Gas Pipeline Co., supra, page 586 of 315 U.S., page 743 of 62 S.Ct., 86 L.Ed. 1037) in fixing rates. It follows that the Commission may, for rate-making purposes, select any permissible formula or combination of formulas which it considers appropriate under the circumstances. While one may reasonably believe that the Commission should in any case receive all evidence which is relevant and material under any theory of rate making, we think it cannot be said, in view of the majority opinion in the Pittsburgh Plate Glass Company case, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251, that the rejection of evidence of reproduction cost or of market or replacement value in the case before us amounted to a denial of due process requiring a remand of the proceeding to the Commission. It is, of course, apparent from the opinion of the Commission that the remand of this proceeding so that the evidence offered and rejected might be received, considered, and then disregarded by the Commission, would be a useless formality. The Commission has stated that it regards such evidence as valueless under the circumstances of this case, and considers that the legitimate cost or prudent investment formula is alone ap-

plicable. While the importance of requiring administrative agencies to observe the minimal requirements of due process cannot be over-emphasized, practical considerations are not to be completely ignored in determining whether a case shall be remanded, where the rights of a party have not been prejudiced by the rejection of evidence which, though admissible, is immaterial in the light of permissible criteria adopted by an agency for determining the issue before it. Moreover, for the purpose of review, this Court may assume that the proffered evidence, if admitted, would have proved all that the petitioners claim for it, namely, that the reproduction cost of their property, less observed depreciation, on June 30, 1941 was $83,957,083.

■ 2. The second question is whether the Commission erroneously assumed jurisdiction over the petitioners' production and gathering of natural gas.

Section 1(b) of the Natural Gas Act, 15 U.S.C.A. § 717(b), reads: "The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

The basis for the petitioners' assertion that the Commission unlawfully exercised jurisdiction over their facilities used in the production of natural gas seems to be that the inclusion in the rate base of the depreciated book cost of such facilities, instead of their present enhanced market value, was erroneous and amounted to an abuse of power.

Petitioners claimed before the Commission, and offered to prove, that leaseholds which were carried on their books at less than $1,000,000 had a market value of about $8,400,000. In their reply brief on reargument, petitioners concede the right of the Commission to value their production property but state that "Their objection to the Commission's procedure is that it refused to admit *evidence from which such a valuation could have been made*. Having refused to admit that evidence, it erred in entering an order which, in effect, limits petitioners' earnings from their production and

gathering properties to a return far below that which would have resulted had the Commission determined the value of the gas through a consideration of the present value of petitioners' production and gathering properties. The entering of this arbitrary order after the exclusion of evidence from which the *value* of the gas at the point where it enters the interstate pipe line could have been determined necessarily constituted an exercise of jurisdiction over production and gathering, a jurisdiction expressly withheld from the Commission."

That is saying, in effect, that the jurisdiction of the Commission extends to making a valuation of petitioners' gathering and production facilities, for rate-making purposes, provided that the Commission does not use a method or apply a formula which results in an underestimate of the value of the gas produced. If there is an infirmity in the Commission's determination of the amount which should be included in the rate base as the cost or value of such facilities, we think the infirmity arises from the method used in making the valuation, and not from any lack of jurisdiction. Since the Commission was not obliged to adopt reproduction or replacement cost in determining "fair value" for rate-making purposes, but could adopt the actual cost or prudent investment formula as a basis, it is impossible for us to say that the Commission exceeded its power in not including in the rate base the present market value of petitioners' leaseholds. The Commission could, no doubt, have increased the rate base by the enhancement in market value of the leaseholds, but we think it was not compelled to do so.

3. The third question is whether the order is invalid because of the Commission's failure to make an allocation or segregation of revenues derived from direct sales of gas to customers for their own use.

Concededly, the Commission has not fixed the petitioners' rates for such sales, and has only prescribed reduced rates for interstate sales of natural gas for the purpose of resale. The petitioners assert, however, that the necessary effect of the Commission's order is to reduce their rates and revenues on all sales and to deprive them of substantial profits from direct sales, and amounts to an assumption of jurisdiction over a part of their business which the Commission may not regulate.

The reasons given by the Commission for declining to make an allocation or segregation of revenues are that the direct sales are made to 19 industrial customers on an interruptible basis, and at prices fixed by competition with other fuels; that no plant capacity has been provided for the direct industrial customers; that deliveries to them are made only when there is excess capacity not required by wholesale customers; that $128,848 of the entire investment in plant (less than one-sixth of one per cent) is used exclusively in the service of the direct sales; that petitioners treat their entire business as a unit and make no segregation of costs or profits as between the two classes of sales; that the incidental direct industrial business of petitioners is in reality a by-product of the wholesale business, comparable to the petitioners' gasoline extraction business; and that there is no showing that the direct sales are so distinct and separate from the general wholesale business that the two cannot be considered together.

The respondents deny that an allocation or segregation of the revenues and expenses attributable to direct sales would have materially affected the result or that the Commission's order reduces the petitioners' income from direct sales. The respondents contend that the order of the Commission gives the petitioners more than the return on direct sales which they contended in their evidence they were entitled to receive. The petitioners, however, assert that the order of the Commission takes from them approximately one-half of the revenue of $1,000,828 a year derived from direct sales.

The record indicates that the 1941 revenue of petitioners from direct industrial sales less expenses, but before Federal income taxes, was $1,000,828; that a fair allocation of this revenue would be to treat one-half of it as derived from direct sales; and that the net amount properly attributable to that nonregulated portion of the business would be $319,656 ($500,414 return less $180,758 income taxes at 1941 tax rates). Under the Commission's order, the petitioners are allowed a 6½% return ($4,363,925) on their entire business. Under the method of allocation proposed by an expert witness of the Commission, $4,017,878 of the return would be attributable to sales at wholesale (subject to regulation), and $346,047 to direct industrial sales (not subject to regulation). There is in the

record a substantial basis for the Commission's conclusion that, in determining reasonable rates for sales of natural gas subject to regulation, it was unnecessary to make a segregation of revenues attributable to sales not subject to regulation, and that, if a segregation had been made, it would not materially have affected the result.

 In determining whether the wholesale rates of a natural-gas company subject to the Act are unreasonable, the Commission is, no doubt, obligated to give appropriate consideration to the fact that the revenues of the company derived from direct sales to customers are not subject to regulation. A failure of the Commission to give appropriate effect to that fact, unless arbitrary or capricious, does not, we think, deprive the Commission of its jurisdiction to make a rate order with respect to sales which are subject to regulation. Jurisdiction to decide a doubtful question of fact includes jurisdiction to decide it either correctly or incorrectly. Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701. The adjustments made necessary by reason of the fact that certain of the sales and revenues of the petitioners are not subject to regulation are, we think, "pragmatic adjustments * * * called for by particular circumstances" (Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037), which the Commission has power to make.

4. The last question for consideration is whether the return allowed by the Commission has been shown to be unjust, unreasonable or confiscatory.

 The opinion of the Supreme Court in the Hope Natural Gas Company

cases indicates to us that, aside from questions relating to procedural due process and to jurisdiction, a reviewing court may interest itself only in the effect of the Commission's order. The court cannot concern itself with the Commission's choice of formulae or the propriety of the methods employed by it in reaching its conclusion, but only with the consequences of the order made. If the effect of the order is to deny to the utility a return sufficient reasonably to meet its necessities and to enable it to continue to render adequate public service, the order is arbitrary and confiscatory and may be set aside. It seems apparent that the Supreme Court is presently of the opinion that, within broad limits, the Federal Power Commission should be freed from judicial interference in regulating rates of natural-gas companies. It is evidently no longer necessary for a reviewing court to consider many of the doubtful and debatable questions which ordinarily arise in every rate case, such as: whether replacement or reproduction cost less observed depreciation, or prudent investment, or historical cost, shall be used as a rate base; whether proper allocation of revenues which are subject to regulation and revenues which are not subject to regulation has been made by the Commission; whether the cost or value of items of property which, for reasons deemed sufficient by the Commission, have been excluded by it from the rate base should have been included; whether the Commission has given due consideration to every pertinent fact; and whether the reasoning of the Commission which underlies its final determination is sound or unsound.[3]

 The order of the Commission must be affirmed unless the petitioners have made a convincing showing that it is un-

---

[3] In Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602–603, 64 S.Ct. 281, 287, the Supreme Court said:

"We held in Federal Power Commission v. Natural Gas Pipeline Co., supra [315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037], that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' Id., 315 U.S. at page 586, 62 S.Ct. [736], 86 L.Ed. 1037. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entire-

ty' meets the requirements of the Act. Id., 315 U.S. at page 586, 62 S.Ct. [736], 86 L.Ed. 1037. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. Cf. Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 304, 305, 314, 53 S.Ct. 637, 643, 644, 647, 77 L.Ed. 1180; West Ohio Gas Co. v. Public Utilities Commission (No. 1), 294 U.S. 63, 70, 55 S.Ct. 316, 320, 79 L.Ed. 761; West v. Chesapeake & Potomac Tel. Co., 295 U.S. 662, 692–693, 55 S.Ct. 894, 906, 907, 79 L.Ed. 1640 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total

reasonable in its consequences because the return allowed is insufficient to enable them to meet their expenses of operation, to pay interest on their bonds and dividends on their stock, to maintain their credit, and to attract capital, or is clearly out of line with the returns on investments in enterprises involving comparable risks.

In the Hope Natural Gas Company cases, original investment or actual cost had been estimated at about $70,000,000, of which $17,000,000 had been charged to operating expenses. The Commission found "actual legitimate cost" to be $51,975,416. From this it deducted $22,328,016 for depletion and depreciation. It added $1,392,021 for future net capital additions, $566,105 for useful unoperated acreage, and $2,125,000 for working capital. This produced a rate base of $33,712,526, which was about one-half of the amount claimed by the company to have been actually invested, and was also about one-half of estimated reproduc-

tion cost less depreciation. The allowed return of 6½% upon this rate base gave the Hope Natural Gas Company an annual return of $2,191,314, as compared with a return of $5,801,171 during the test year 1940.

 In the instant case, petitioners assert that the "prudent investment" (as of December 31, 1941) upon which they were entitled to earn a fair return was at least $75,725,676. As already stated, the Commission found actual legitimate cost to be $78,814,292; deducted $12,596,987 for depreciation; and added $920,000 for working capital; producing a rate base of $67,137,305. The Commission declined to include in the rate base $4,944,820 invested in construction work in progress, and budget estimates of $6,372,100 to complete construction. The Commission found that the facilities under construction were to meet new demands for service to territory not already served by the petitioners, the revenues from which could not be estimated.

effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. Cf. Railroad Commission v. Cumberland Tel. & T. Co., 212 U.S. 414, 29 S.Ct. 357, 53 L.Ed. 577; Lindheimer v. Illinois Bell Tel. Co., supra [292 U.S. 151] pages 164, 169, 54 S.Ct. 658, 78 L. Ed. 1182]; Railroad Commission v. Pacific Gas & Electric Co., 302 U.S. 388, 401, 58 S.Ct. 334, 341, 82 L.Ed. 319.

"The rate-making process under the Act, i. e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests. Thus we stated in the Natural Gas Pipeline Co. case that 'regulation does not insure that the business shall produce net revenues.' 315 U.S. at page 590, 62 S.Ct. [736], 86 L.Ed. 1037. But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but al-

so for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U.S. 339, 345, 346, 12 S.Ct. 400, 402, 36 L.Ed. 176. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. See State of Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U.S. 276, 291, 43 S.Ct. 544, 547, 67 L.Ed. 981, 31 A.L. R. 807 (Mr. Justice Brandeis concurring). The conditions under which more or less might be allowed are not important here. Nor is it important to this case to determine the various permissible ways in which any rate base on which the return is computed might be arrived at. For we are of the view that the end result in this case cannot be condemned under the Act as unjust and unreasonable from the investor or company viewpoint."

The court also said (page 605 of 320 U.S., page 289 of 64 S.Ct.):

" * * * Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called 'fair value' rate base."

The 6½% return allowed by the Commission gave petitioners a return of $4,363,-925 annually over and above expenses of operation and allowances for depreciation, depletion, amortization, and taxes. The petitioners' long-term debt as of February 28, 1942, was $33,254,500. The annual interest cost upon it was determined to be 2.88%, or $957,730. The preferred stock outstanding was $16,000,000, and the dividend cost upon it was found to be 5.87%, or $939,200 annually. Therefore, the service cost on bonds and preferred stock is $1,-896,930 per annum; leaving $2,466,995 as earnings for the common stock. Petitioners have common stock outstanding to the amount of $20,184,175. The annual return upon common stock under the rates allowed by the Commission exceeds 12%. Petitioners, however, contend that they are entitled to at least a 12% return on their common stock and surplus, which together amount to $27,294,990. They state that unless they have such a return the common stock will not be attractive to purchasers. They argue that the least amount they should be allowed to earn upon common stock and surplus is $3,275,399, and that the return allowed by the Commission is about $800,-000 short of being adequate. They also refer to the fact that sinking fund requirements and necessary additions to surplus will or may prevent adequate distributions of earnings to common stockholders.

It is, to say the least, doubtful that earnings of approximately $2,500,000 annually (9%) upon the common stock and surplus of petitioners—whether such earnings are distributed each year or accumulated—would make the petitioners' securities unattractive to purchasers. The evidence indicates that such a return compares not unfavorably with the returns upon similar investments involving comparable risks. In any event, there is nothing in the opinion in the Hope Natural Gas Company cases to justify a belief that this Court could successfully substitute its judgment for that of the Commission with respect to the debatable question whether the return allowed the petitioners is sufficient to attract investors, or that we could invalidate the Commission's order upon the theory that the return allowed is obviously so unfair and inadequate as to be confiscatory.

■ Attention should be directed to the fact that the order complained of is not final and irrevocable. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 615, 64 S.Ct. 281. It must be assumed that if actual experience demonstrates that the rates as reduced by the Commission are unreasonably low, the Commission will allow the petitioners to increase their rates. This Court cannot presume that if either unreasonably low or unreasonably high interim rates are prescribed by the Commission, they will be perpetuated. We regard the order under review as a preliminary one made to cover a reasonable test period and subject to change by the Commission if experience shall prove that the rates fixed are either too low or too high.

Unless we have misconceived the teachings and implications of the opinion in the Supreme Court in the Hope Natural Gas Company cases, the standards by which the validity of the Commission's order is to be judged require its affirmance.

We shall, of course, retain jurisdiction over the funds which have been and are being impounded under the stay order which was granted by this Court to preserve the status quo pending the final determination of this case.

The mandate of this Court will be withheld for sixty days to allow the petitioners to apply to the Supreme Court for certiorari. If certiorari is applied for within that time, the mandate will be retained until the application is ruled upon, and, if it is granted, until the case is finally determined.

The order of the Commission is affirmed.

RIDDICK, Circuit Judge (dissenting).

I agree with the result reached by the majority on all points decided except on the question concerning the refusal of the Commission to make an allocation as between the interstate sales and transportation of petitioners, subject to the Commission's jurisdiction, and their interstate sales and transportation beyond the jurisdiction of the Commission. Heretofore, the Commission has recognized the necessity of such an allocation and has made it. In re Interstate Natural Gas Co., Inc., 48 P.U.R.,N.S., 267, 279; In re Canadian River Gas Co. et al., 43 P.U.R.,N.S., 205, 231; In re Cities Service Gas Co. 50 P.U.R.,N.S., 65, 89. That a separation of transactions within and beyond the jurisdiction of the Commission is required by the Natural Gas Act, and must be made in order that "regulation may be confined to its permitted field" is held in Colorado Interstate Gas Co. v. Federal Power Commission, 10 Cir., 142 F.2d 943. Here the Commission has admittedly refused to observe the limit upon

its jurisdiction, fixed by Congress. In this situation it seems to me idle to inquire whether the Commission's order, call it a "pragmatic adjustment" or what-not, does or does not result in confiscation of petitioners' property, or whether it is less or more favorable to petitioners than would have been the case had the Commission confined itself to its permitted field. It is enough to require a remand of this proceeding that the Commission has exceeded the statutory limitation on its powers.