**PANHANDLE EASTERN PIPE LINE CO. et al. v. FEDERAL POWER COMMISSION et al.**

No. 12466.

United States Court of Appeals Eighth Circuit.

Dec. 29, 1949.

Concurring Opinion March 4, 1950.

Robert P. Patterson, New York City (John S. L. Yost, New York City and Mr. Samuel H. Riggs, Detroit, Mich., were with him on the brief), for Panhandle Eastern Pipe Line Company.

Irving B. Feldman, Assistant Attorney General and Deputy State Public Administrator of the State of Michigan, and Raymond J. Kelly, Corporation Counsel for the City of Detroit, Michigan, Detroit, Mich. (Stephen J. Roth, Attorney General of the State of Michigan, Graydon G. Withey, Deputy Attorney General of the State of Michigan, and D'Arcy O'Brien, Assistant Attorney General and State Public Administrator of the State of Michigan, were with them on the brief), for the State of Michigan.

Clyde H. Jones, Deputy Attorney General of the State of Indiana, (J. Emmett McManamon, Attorney General of the State of Indiana, was with him on the brief), for the State of Indiana.

J. E. Taylor, Attorney General of the State of Missouri, and Harry H. Kay, Assistant Attorney General of the State of Missouri, filed brief for the State of Missouri.

Lambert McAllister, Special Counsel, Federal Power Commission, Washington, D. C. (John F. Sonnett, Assistant Attorney General of the United States, Bradford Ross, General Counsel, Federal Power Commission, Washington, D. C., J. Francis Hayden, Special Assistant to the Attorney General, William Jordan, Jr., Attorney, Department of Justice, Charles E. McGee, Assistant General Counsel, Federal Power Commission, and William S. Tarver, Assistant General Counsel, Federal Power Commission, Washington, D. C., were with him on the brief), for the Federal Power Commission and the United States.

Before GARDNER, Chief Judge, and SANBORN, WOODROUGH, THOMAS, JOHNSEN, RIDDICK, and COLLET, Circuit Judges.

SANBORN, Circuit Judge.

The question for decision is whether the Panhandle Eastern Pipe Line Company (which will be referred to as "Panhandle") is equitably entitled to be reimbursed, out of the undistributed residue of an impounded fund, for the expenses which Panhandle has paid, at the direction of the Court, in connection with the distribution of the fund to the ultimate consumers (in seven states) of natural gas sold during the impoundment period by Panhandle to 52 local distribution companies (hereafter referred to as "distributors") at rates in excess of those fixed by an order of the Federal Power Commission.

The Federal Power Commission, which has jurisdiction over Panhandle under the Natural Gas Act, as amended, 15 U.S.C.A. § 717 et seq., entered an order on September 23, 1942, requiring Panhandle to reduce its rates by approximately $5,000,000 per annum. Panhandle petitioned this Court for a review of the Commission's order

and a stay pending review. After a hearing, the Court entered a stay order dated December 7, 1942, which contained the following provisions:

"Until further order of this Court, the above order of the Federal Power Commission is stayed upon the conditions following:

"1. The monthly difference between payments to petitioners under existing rates or arrangements and those required under the order of the Commission shall be promptly paid over to John G. Hughes of Kansas City, Missouri, as the custodian of this Court [J. W. Perry succeeded Mr. Hughes], not later than the twenty-fifth of the succeeding month, to be held by him for the benefit of the ultimate consumers or of petitioners as in this litigation may be determined entitled thereto. Such payments for months prior to this order shall be made by December 15, 1942. Triplicate receipts for each of such payments shall be given petitioners by the custodian, one of which shall be promptly filed, by petitioners, with the Clerk of this Court and one with the Federal Power Commission.

"2. The entire expenses of impounding (including, among other things, protecting, investing and distributing to petitioners or to ultimate consumers) of these funds shall be borne by petitioners. Whether any earnings on such funds (while so impounded) may be applied upon such expenses is reserved for future determination. When and as required by orders of this Court, petitioners shall pay to the custodian such expense money, upon triplicate receipts, which shall be filed as above.

"3. No interest shall be charged petitioners upon such impounded funds unless allowed upon application hereafter made by respondents or any of them. Such future applications may be made only (a) if and when petitioners fail to be ready to present this review upon the merits on May 14, 1943 (as set for hearing by a separate order entered as of this date), or (b) if and when this Court shall enter its decree or order sustaining the above order of the Commission and shall deny any petition for rehearing which may be filed thereto. Any interest allowed hereafter shall be at the rate of four per centum annually from the date of such allowance or thereafter as required by any orders of allowance.

"4. Full power and jurisdiction is reserved to cancel or modify this order and to enter any other orders (with or without application of the parties) to protect or to promote the rights and interests of the parties to this litigation and of the ultimate consumers financially interested in the impounded funds."

The Commission's rate-reduction order was affirmed by this Court on June 6, 1944, 143 F.2d 488, and its decision was affirmed by the Supreme Court on April 2, 1945, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241. Panhandle filed with the Commission new schedules of reduced rates, which were approved November 2, 1945, effective as of November 1, 1942.

While the case was pending in this Court and the Supreme Court, Panhandle, in compliance with the stay order, made monthly deposits with the Custodian appointed by this Court, in amounts substantially equivalent to the excess charges collected by Panhandle from the distributors to which it sold gas.

After the new rate schedules were approved by the Commission in November 1945, the exact amount of refund due each distributor which had purchased gas from Panhandle was determined and a report thereof was made to this Court by the Commission. The aggregate amount of these refunds was $24,858,954.72. That amount represented the total of the deposits finally made by Panhandle with the Custodian. The Custodian had, in addition, earnings derived from the investment by him, at the Court's direction, of the impounded fund in short-term government securities.

Upon a petition of the United States, asserting that it had a substantial interest in the fund impounded, this Court on December 12, 1945, issued an order directing the parties and the distributors of gas purchased from Panhandle during the impoundment period, to appear before the Court on December 28, 1945, and to show cause why an order should not be made

directing the distribution of the fund to the ultimate consumers who, during that period, had purchased gas from the distributors. Some of the distributors filed claims for their respective shares of the impounded fund, some disclaimed all interest in it, some filed conditional disclaimers, and some made no response to the show cause order.

Panhandle, in its response to the order, asked that the stay order of December 7, 1942, be modified by eliminating the provisions requiring it to pay any part of the cost of distribution of the fund to ultimate consumers, and that an order be entered fixing the cost of distributing the fund to the distributors from whom the excess charges had been collected by Panhandle, and providing that, upon payment of that amount and any costs due the Clerk of this Court, Panhandle be discharged from further liability under the stay order. It was Panhandle's contention that this Court could not lawfully or reasonably require it to pay the expense of distributing the impounded fund, or any part of it, to ultimate consumers, with whom it had never had any contractual relations or dealings of any kind. On March 1, 1946, the Court held a hearing on Panhandle's motion for a modification of the stay order, and on April 5, 1946, filed its decision and order, 8 Cir., 154 F.2d 909, denying Panhandle's prayer to be relieved of the expense connected with the distribution of the fund to ultimate consumers. The Court, however, modified the stay order to the extent of providing that the earnings of the fund could be applied upon expenses of distribution. Judge Riddick, being of the opinion that the expenses of distribution to ultimate consumers could not lawfully be imposed on Panhandle, dissented, pages 912-913 of 154 F.2d. Panhandle applied to the Supreme Court for certiorari, but its application was denied.

On March 12, 1946, the Court appointed a Special Master and imposed upon him the burden of formulating fair and equitable plans for the distribution, in each of the seven states in which Panhandle had sold gas during the impoundment period, of so much of the impounded fund as had been allocated to the distributors in that state, and of supervising, under the orders of the Court, the carrying out of the plans adopted by it.

The aggregate amount of refunds claimed by distributors was $4,373,974.68. Each distributor who claimed that it was entitled to the refund allocated to it was paid the amount of the refund upon filing an undertaking to pay any claims which subsequently might be adjudged superior to its own claim. There was left in the hands of the Court $20,484,980.04 disclaimed by distributors. This amount the Court felt itself obligated to distribute to ultimate consumers, of whom there were more than 1,000,000.

In developing plans of distribution, the Special Master was required to hold many hearings in the various States, to confer with the State Utilities Commissions, to determine the equities as between classes of consumers, and to decide what plans and methods of distribution would be most fair and equitable in each of the states. These plans, after their formulation, were recommended by the Special Master to the Court and were adopted by it. The Special Master personally supervised the distribution in Texas, Kansas and Ohio, where the amounts to be distributed were not large as compared with other states. In each of the states of Missouri, Illinois, Indiana and Michigan, distribution was effected under the supervision of the Special Master and a State Administrator selected by him and appointed by the Court.

Through the efforts of the Special Master and the State Administrators, the Court was able to distribute to ultimate consumers, with reasonable promptness and without serious controversy or criticism, approximately 95% of the fund. There remains in the hands of the Court an undistributed residue of about $1,300,000.[1] This residue represents small sums allotted to consumers who could not be located. Some claims are still being presented to the Court and are being paid, but it is ap-

---

1. The exact amount of the residue on October 31, 1949, was $1,360,322.74.

parent that the residue now on hand will not be greatly diminished by payment of claims of unlocated ultimate consumers.

Panhandle's motion for reimbursement of its expenses out of the undistributed residue of the fund was filed in October, 1946. At that time there was no such residue, and, while the motion was submitted, decision was deferred, but without prejudice to Panhandle. A further hearing on the motion was held May 7, 1949. Panhandle, on May 2, 1949, had filed a supplement to its motion, which showed that it had expended up to March 31, 1949, for expenses of distribution, $820,370.81, after deducting $434,852.20 received from the Custodian as the net earnings of the impounded fund after settlement of his liability for federal income taxes on such earnings. The Court later decided that the motion should be re-argued to the Court en banc, because of the importance of the questions involved and the fact that the stay order had been entered and conditioned by a different division of the Court than that to which the motion was submitted. The motion has now been fully argued and finally submitted.

The contentions of Panhandle are, in substance, that the Court has jurisdiction to grant Panhandle's prayer for reimbursement and that, in justice and equity, it should be granted. Panhandle argues that to require it to bear the entire cost of distributing the impounded fund to ultimate consumers is unjust and in the nature of a penalty; that the reduced rates fixed by the Commission were intended to yield no more than a nonconfiscatory return, and the Commission did not contemplate that the return should be reduced by the cost of distributing the impounded fund; that the fund, being in the nature of a trust fund, equitably should be required to stand the expense of its distribution to ultimate consumers; that sound judicial policy requires the reimbursement of Panhandle out of undistributed funds; that similar reimbursement was approved by the Circuit Court of Appeals of the Tenth Circuit in the case of Colorado Interstate Gas Company v. Federal Power Commission, 1946, (in an unreported order), and in Cities Service Gas Company v. Federal Power Commission, 1947, (in an unreported order), both of which cases involved the distribution to ultimate consumers of impounded funds; and that in Natural Gas Pipeline Company of America v. Federal Power Commission, 7 Cir., 129 F.2d 515, the Company, which had given a bond to repay excess charges, was not required to pay the expenses of distribution to ultimate consumers.

The Federal Power Commission asserts, in effect, that Panhandle has no right, either at law or in equity, to the undistributed portion of the impounded fund; that the application of unclaimed moneys can only be made at the expense of the unlocated ultimate consumers entitled thereto; that their rights to the fund have been established; that the law requires the deposit of the unclaimed moneys in the Treasury of the United States, 28 U.S. C.A. § 852, repealed effective Sept. 1, 1948, now § 2042 of new Title 28 U.S.C.A.; that while the rights of distributees may ultimately escheat to the states, Panhandle has no right to such moneys; that the fund is a trust fund and the distributees are entitled to have their rights protected by the Court; that in Illinois Bell Telephone Co. v. Slattery, 7 Cir., 102 F. 2d 58, certiorari denied 307 U.S. 648, 59 S.Ct. 1045, 83 L.Ed. 1527, the utility was not permitted to have reimbursement of its expenses of distribution out of unclaimed funds; that it was proper for this Court, in granting a stay, to impose the entire expense of distribution on Panhandle; that Panhandle sought the stay for its own benefit, and suggested that the stay order should provide for the return of impounded funds to ultimate consumers; that, by procuring the stay order, Panhandle prevented the distributors to whom it sold gas from reducing their rates to ultimate consumers and prevented State regulatory bodies from taking steps to reduce the local gas rates of distributors; that the large number of disclaimers filed by distributors indicates that, had Panhandle promptly reduced its rates as directed by the Federal Power Commission, such utilities would have reduced their

rates for gas sold at retail; that the stay order required the impoundment of excess charges "for the benefit of the ultimate consumers" and that Panhandle bear "the entire expenses of impounding (including, among other things, protecting, investing and distributing to petitioners or to ultimate consumers) * * *"; that the stay order was acceptable to and was accepted by Panhandle at the time it was entered; that this Court subsequently refused to modify the order to relieve Panhandle of any of the expenses of distribution; and that the Supreme Court denied Panhandle's petition for a review of such refusal.

The states of Michigan, Missouri and Indiana resist the granting of Panhandle's motion, for substantially the same reasons urged by the Federal Power Commission. These states, because of their escheat statutes, have an interest in resisting the diminution of the unclaimed residue of the impounded fund proposed by Panhandle.

The State of Michigan suggests, in addition, that it would be desirable and permissible for this Court to now deposit with the State Board of Escheats, subject to such directions and conditions as this Court might see fit to impose, the unclaimed portion of the funds allocated to that state.

We do not doubt the power of this Court to provide for the reimbursement of Panhandle out of the undistributed and undistributable residue of the impounded fund, if that is the equitable and just thing to do. This Court undoubtedly could originally have provided in its stay order for such reimbursement, and we think that nothing has since occurred to deprive the Court of jurisdiction to make any modification of the order which equitably ought to be made.

Panhandle is not subject to any just criticism for any action which it has taken in this case. Its petition for review of the order of the Federal Power Commission presented questions of law which were at the time doubtful. This can readily be gleaned from the opinion, and dissenting opinion, of this Court in this case, 143 F.2d 488, the opinion of the Supreme Court af-

firming this Court, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241, and the opinion of the Circuit Court of Appeals of the Fourth Circuit in Hope Natural Gas Co. v. Federal Power Commission, 134 F.2d 287, decided February 16, 1943, and reversed on January 3, 1944, by the Supreme Court in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

There was no impropriety in Panhandle's asking for a stay of the order of the Federal Power Commission in order to preserve the status quo pending review, and no impropriety in this Court's granting the application upon terms. Panhandle's motion to be relieved of any costs in connection with the distribution of the fund to ultimate consumers, heard in March, 1946, raised a doubtful question which it was entirely proper to present to this Court for consideration and decision. In this connection, we note that the Circuit Court of Appeals of the Fifth Circuit, in Interstate Natural Gas Co., Inc., v. Federal Power Commission, 166 F.2d 796, took the position that that court could not order the distribution of a similar impounded fund to ultimate consumers of gas. The Supreme Court, however, reversed, in Federal Power Commission v. Interstate Natural Gas Co., 336 U.S. 577, 69 S.Ct. 775. Compare, also, Cities Service Gas Co. v. Federal Power Commission, 10 Cir., 176 F.2d 548.

In fairness to Panhandle, it should be said that it has at all times promptly complied with every order and direction of this Court, and has done all that it reasonably could do to assist the Court and its Special Master in their efforts to effect a prompt, economical, and thorough distribution of the fund in suit to ultimate consumers in accordance with the plans approved by the Court.

The questions whether Panhandle should be granted or denied the relief which it asks, either in whole or in part, are questions about which there can be an honest difference of opinion. The weakness of Panhandle's position is that it procured a stay of a rate-reduction order which was presumptively correct and turned out to be valid; that it thereby postponed whatever

benefits ultimate consumers of its gas would have derived from the reduced wholesale rates for gas, had the rate order of the Commission gone into immediate effect; that the stay order entered by this Court contemplated that Panhandle should pay the expenses of distributing the fund; that Panhandle accepted the stay order upon those terms; and that the Court later denied Panhandle's motion to be relieved of responsibility for such expenses.

It is true, however, that the stay order did not expressly provide, nor necessarily imply, that Panhandle should not be reimbursed out of the undistributed residue of the fund; and that the Court expressly reserved jurisdiction to modify the stay order. The subsequent order of this Court declining to modify the stay order did not refer to the matter of possible reimbursement of Panhandle out of the undistributed residue, nor was that question presented to, or considered by, the Court at that time. What this Court was concerned about in March and April of 1946 was whether the expenses of distribution were to be initially paid by Panhandle or were to be taken out of the impounded fund. If Panhandle was to pay the expenses, as contemplated by the stay order, then the entire principal of the impounded fund was for distribution. On the other hand, if the fund was to pay expenses, the exact amount for distribution could not then be definitely known or accurately estimated. It was essential for the Court to know, before undertaking distribution, the exact amount of the fund which was for distribution.

■ We think that in granting a stay order in a case such as this, it is sound judicial policy to require, as this Court did, that the applicant for the stay shall initially pay all of the necessary expenses to which the Court may be put in effecting a distribution of the fund, in case that becomes necessary. To what extent, if at all, the applicant should be reimbursed out of the earnings and the undistributable residue of the fund, will depend, we think, upon the circumstances of the particular case, and must be left largely to the sound judgment and discretion of the court which is charged with the distribution. No doubt, the justification which the applicant had for challenging the rate-reduction order, the extent of the harm resulting from the granting of the stay, the reasonableness of the expenses imposed upon the applicant, whether they are so great as to amount to an unjust exaction, and the ability of the applicant to pay them without undue hardship, are some of the factors to be considered in determining the propriety of providing any means of reimbursement.

■ It is to be remembered that the orders of regulatory commissions are clothed with the presumption of validity, and that the granting of stays of rate-reduction orders should be the exception and not the rule. A utility challenging such an order, when it applies to the reviewing court for a stay of the effective date and asks that rates found to be excessive be kept in effect, takes a calculated risk. It should be prepared, if it loses, to bear at least some substantial portion of the costs and expenses resulting from the stay. The entire expense, we think, should not ordinarily be taken out of the fund nor should the undistributed residue afford complete reimbursement.

■ Our conclusion is that this Court would not, under all the circumstances, be justified in granting Panhandle's motion for complete reimbursement of the expenses of distribution of the fund to ultimate consumers. On the other hand, we think it would be equitable and just to lessen to some extent the burden of expense which Panhandle has borne.[2] We have concluded

2. A report of Panhandle of the expenses of distribution to July 31, 1949, indicates that total expenses were $1,355,027.03. Deducting $434,852.20 which Panhandle received from earnings of the fund, leaves $920,174.83 as its net expenditures. The report shows that the compensation and expenses of the Special Master and the State Administrators was $257,198.26, and that there was paid to the Custodian, J. W. Perry, for services and expenses, $32,332.77, and to his predecessor, John

to allow it reimbursement to the extent of $250,000.00 out of the undisposed of residue of the fund, upon the condition that Panhandle file an undertaking to restore to the fund, if that shall be ordered by the Court, any portion of that amount, should that become necessary to enable the Court to pay just claims of ultimate consumers against the fund. The contingency is so remote as to be virtually nonexistent, but should be protected against.

The several undistributed portions of the impounded fund are deposited to the credit of the Court in a bank which is an authorized depositary for United States funds, in each of the states from which the undistributed funds were derived and to which they are allocated, with the exception of the funds allocated to the states of Texas, Kansas and Ohio, which are on deposit in an authorized depositary in Kansas City, Missouri.[3]

▮ The State of Michigan, in its resistance to the motion of Panhandle for reimbursement, as has already been stated, suggests that the unclaimed money allocated to that State be deposited with the State Board of Escheats, which, by Michigan law, is authorized to act as a depositary and administrator of unclaimed funds. While that might be convenient, we think it cannot be done. The fund in the hands of this Court is a trust fund. Its control and disposition are governed by federal law. It has not yet been fully administered by this Court. The State of Michigan will, no doubt, ultimately receive the residual portion of the undistributed funds to which it may be entitled, but only after it has been held by this Court for five years and then deposited in the United States Treasury, pursuant to § 2042, Title 28 U.S.C.A.

Since Panhandle or those who have opposed the motion of Panhandle, or some of them, may wish to seek a review of this Court's order, no payment hereunder will be made to Panhandle while this order is subject to or under review.

The motion of Panhandle, to the extent outlined in this order, is granted.

COLLET, Circuit Judge, concurs in the result, and reserves the right to state his views in a separate opinion to be filed later.

RIDDICK, Circuit Judge (dissenting).

The court has now reaffirmed its jurisdiction to modify the terms of its stay order of December 7, 1942, and asserted its power to reimburse Panhandle out of the undistributed and undistributable residue of the impounded fund for the expenses imposed on Panhandle by that order. At the same time the court holds that the stay order did not explicitly or by implication provide that Panhandle should not be reimbursed from the undistributed residue of the impounded fund. The court then concludes that Panhandle is equitably entitled to reimbursement to the extent of approximately one-half of the expenses incurred by it in obedience to the court's order. The apparent reason for this conclusion is that Panhandle agreed to an order, which the court says "turned out to be valid," placing on Panhandle the expenses from which it now seeks relief.

The stay order of December 7, 1942, insofar as it provided for a distribution to ultimate consumers acquired whatever validity it ever had from the consent of the distributors who purchased gas from Panhandle. The action of the court subsequent to the making of the order, requiring these

G. Hughes, $2,300.00. The other expenses consisted mainly of the amounts it was necessary to pay the service organizations which did the detail work of ascertaining and listing the names and addresses of the ultimate consumers who were entitled to refunds, determining the amount of the refund to which each was entitled, issuing the necessary checks, etc.

3. On October 31, 1949, the amounts on deposit to the credit of the Court were as follows:

| Illinois | $ 202,619.29 |
| Missouri | 42,830.93 |
| Indiana | 236,555.70 |
| Michigan | 875,540.71 |
| Kansas, Texas, and Ohio | 2,776.11 |
| Total | $1,360,322.74 |

distributors to show cause why the fund should not be paid over to their consumers instead of to them, and its order paying over to distributors such portion of the fund as they refused to surrender show that the stay order "turned out to be valid" only when and to the extent that the distributors later consented to it. It is accurate to say that the expense from which Panhandle now seeks relief was placed upon it by the action of the distributors rather than by any power in this court when the order was made.

But the validity of the original stay order is of no importance on the question now before the court. When that order was made the court and Panhandle assumed that the fund would be distributed in its entirety to those entitled to receive it. The order made no provision concerning a residue of the impounded fund remaining in the hands of the court for want of consumers to whom it could be distributed. Reference to the order now in deciding what should be done with such a residue of the impounded fund leads only to confusion. For all practical purposes the distribution contemplated by the stay order has now been completed. To the extent of the expense of distribution, no distributor and no consumer has any interest in or claim upon the undistributed residue now in the hands of the court. That residue is very appropriately described as "dead money." No legally enforceable claim exists against it.

The only question before the court now is whether the court should, as a court of equity having plenary power over the fund in its hands, reimburse Panhandle for expenses incurred by it in accomplishing what the stay order contemplated, a complete distribution of the impounded fund to those entitled to receive it. When the equities in favor of Panhandle are recognized, I can find no sound reason for awarding it less than all of the expenses incurred. In such a situation to award it less than all is to impose upon Panhandle a penalty for having resorted to the courts for the final determination of the validity of the order of the Federal Power Commission which

was questionable at the time it was made; and this when the rights of all who claimed or became entitled to a share in the fund have been fully satisfied free of expense or charge to any of them.

Perhaps Panhandle has no equitable right to reimbursement for the expense of impounding and managing the fund as distinguished from the expense of distribution. But at least it should be allowed reimbursement for its full expense of distribution to the ultimate consumers, whose right to share in the fund, whatever its source, has been carefully and completely satisfied.

COLLET, Circuit Judge (concurring separately).

I concur in everything that is said in the majority opinion and in the result reached. However, it is my understanding that one of the primary facts which led to the justification of the allowance made was the fact that the applicant had in this particular case rendered services of an unusual value in the distribution of the fund to those to whom it belonged, thereby reducing the cost of distribution and increasing the percentage of the fund distributed to the multitude of individuals entitled to it. It seems to me that the importance of that fact in arriving at the result reached can and should with propriety be given more emphasis.

An allotment could not properly be made to applicant of any part of the residue fund to cover all or a portion of the expenses incurred and paid by applicant in distributing the fund merely and only because those expenses were incurred for that purpose, because applicant was obligated to pay the costs of distribution as one of the usual incidents resulting from the affirmance of the Commission's order as required by the order of this court. Nor could an allotment of the residue or any part of it be made to applicant merely because it was "dead money"; as the dissenting opinion characterizes it, because it was not "dead money" in the sense that it did not belong to anyone. The law makes ample provi-

sion for the ownership. But there are more serious reasons why the fact that all of the money impounded was not distributed should not justify giving it to applicant. Always when funds are impounded for years under these circumstances there is a considerable residue remaining, because disbursement cannot be made to many of those primarily entitled to it. If the utility is to understand that if it is unsuccessful in its appeal from an order of the Commission and there is money remaining after efforts to distribute it have been made, that it will be awarded any part of those funds to cover the expenses resulting from that appeal merely because there are such residue funds, then it will thereby be given to understand that it only has either to do a poor job of distribution, or to lend the court's officials charged with distribution little or no assistance, or even to impede distribution by inefficiency or indifference, thereby creating a residue fund or a larger such fund, and thereby justifying an allowance or a larger allowance for costs and expenses resulting from the appeal. Such a rule would not only place a premium to the utility on inefficient distribution, but would also have a tendency to promote appeals and reviews of orders of the Commission.

I think that it should be definitely understood that it will not be enough to justify an allowance out of a residue fund to apply on expenses of distribution after unsuccessful appeal from an order of the Commission, that the utility show that it has, as the original impounding order required, paid the cost of distribution, that there was a residue fund remaining, and the other facts stated in the majority opinion, but it should also be required to show that it has done more than the impounding order required and has furnished services of a nature and value beyond those necessary to the usual and ordinary compliance with the conditions specified by the court in its impounding order, and that the allowance requested is a fair compensation for the value of the services rendered beyond the call of its duty. If that be clearly understood, then the incentive premium will be upon efficient and effective compli-

ance with the court's orders and not upon poor or non-compliance therewith.

The facts in this case justify the result reached under the above-stated principles, hence my concurrence in that result.