## PANHANDLE EASTERN PIPE LINE CO. ET AL. *v.* FEDERAL POWER COMMISSION ET AL.

No. 296. Argued January 29, 1945.—Decided April 2, 1945.

Messrs. *Ira Lloyd Letts* and *John S. L. Yost*, with whom Messrs. *D. H. Culton* and *Samuel H. Riggs* were on the brief, for petitioners.

Messrs. *Chester T. Lane* and *Charles V. Shannon*, with whom *Solicitor General Fahy*, *Assistant Attorney General Shea*, Messrs. *Paul A. Sweeney*, *Harry S. Littman*, *Stanley M. Morley*, *William E. Dowling*, *James H. Lee*, *Harold Goodman*, *Herbert J. Rushton*, Attorney General, and *James W. Williams*, Assistant Attorney General, of Michigan, were on the brief, for respondents.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Panhandle Eastern Pipe Line Co. (whom we will call Panhandle Eastern) owns properties which constitute a natural gas production, transportation, and marketing system.[1] The system extends from gas fields in Texas, Oklahoma and Kansas through Missouri, Illinois, Indiana and Ohio and into Michigan.[2] The· City of Detroit and the County of Wayne, Michigan, filed a complaint with the Federal Power Commission alleging that Panhandle Eastern's rates on gas sold to a distributing company in Michigan for resale there were unjust and unreasonable. The Commission on its own motion instituted an investigation under the Natural Gas Act of 1938, 52 Stat. 821, 15 U. S. C. § 717, of all of the interstate wholesale rates of Panhandle Eastern.[3] Following extended hearings the Commission entered an interim order, here under review, finding petitioner's interstate wholesale rates to be excessive and requiring petitioner to reduce them on and after November 1, 1942, as to reflect, when applied to petitioner's 1941 transportation and sales, a reduction of not less than $5,094,384 per annum below the 1941 consolidated gross operating revenues of $17,789,573. See 45 P. U. R. (N. S.) 203, 223. That order was affirmed by

---

[1] The other petitioners, Illinois Natural Gas Co. and Michigan Gas Transmission Corp., were wholly owned subsidiaries of Panhandle Eastern. They sold all of their properties to Panhandle Eastern after these proceedings were instituted and were then dissolved. Accordingly, we will refer throughout to the three companies as "petitioner."

[2] The Commission found that the aggregate lines in this system constitute "the longest natural-gas pipe line in the world, serving more than 200 cities, towns, and communities with more than 700,000 retail customers in Texas, Kansas, Missouri, Illinois, Indiana, Michigan, and Ohio." 45 P. U. R. (N. S.) 203, 208.

[3] The investigation also included Illinois Natural Gas Co. and Michigan Gas Transmission Corp. See note 1, *supra*.

the Circuit Court of Appeals for the Eighth Circuit, one judge dissenting in part. 143 F. 2d 488. The case is here on a petition for a writ of certiorari which we granted limited to the two questions which we will discuss. But before we reach them we must dispose of a challenge made by the City of Cleveland, as *amicus curiae,* to the jurisdiction of the Circuit Court of Appeals for the Eighth Circuit over the subject matter of this litigation. Panhandle Eastern sought review in that court of the Commission's order under § 19 (b) of the Act which so far as material here provides:

"Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the circuit court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia . . ."

The petition for review stated that petitioner had its principal place of business in Kansas City, Missouri. That was not denied by the Commission and at no time prior to the entry of the judgment affirming the Commission's order was the jurisdiction of the Circuit Court of Appeals challenged. After the judgment of affirmance had been entered, however, the City of Cleveland filed a motion in the Circuit Court of Appeals for leave to intervene and challenged the jurisdiction of that court on the ground that petitioner did not have its principal place of business in that circuit. The same objection is pressed here.

If the objection is to the jurisdiction of the court, it does not come too late. *Industrial Addition Assn.* v. *Commissioner,* 323 U. S. 310. But we think it goes to venue, not to jurisdiction. We read § 19 (b) to invest all intermediate federal courts with the power to review orders of the Commission, provided, however, that if a Circuit Court of

Appeals, rather than the Court of Appeals for the District of Columbia, is chosen, the parties may object that the particular circuit lacks the specified qualifications. Venue relates to the convenience of litigants. *Neirbo Co.* v. *Bethlehem Corp.*, 308 U. S. 165. The provisions of § 19 (b) plainly are of that character. Review in the Court of Appeals for the District of Columbia where the Commission must maintain its principal office and hold its general sessions (46 Stat. 797, 16 U. S. C. § 792) is convenient for the Commission. Review in any circuit where the natural gas company is located or has its principal place of business is designed to serve the convenience of the company. The general grant of authority in § 19 (b) to all the courts of appeal suggests that the question of which one should exercise the power in a particular case is a question of venue. None of the respondents objected at any time to the venue of the court below. The right to have a case heard in the court of proper venue may be lost unless seasonably asserted. *Industrial Addition Assn.* v. *Commissioner, supra.* It may be waived by any party, including the government. *Peoria & P. U. R. Co.* v. *United States,* 263 U. S. 528, 535–536; *Industrial Addition Assn.* v. *Commissioner, supra.* The objection of the City of Cleveland, which came after judgment had been rendered, came too late. Cf. *United States* v. *California Canneries,* 279 U. S. 553, 556. Hence, we need not decide whether the suit was brought in the proper circuit.

*Segregation of the Regulated and Unregulated Businesses.* Panhandle Eastern makes direct industrial sales as well as sales to distributing companies for resale. The Commission made no segregation or separation of the properties used in these two classes of business. Nor did it make an allocation of costs between the regulated and unregulated phases of the business as it did in *Colorado Interstate Gas Co.* v. *Federal Power Commission, Canadian River Gas Co.* v. *Federal Power Commission,* and *Colorado-Wyoming Gas Co.* v. *Federal Power Commission,*

*ante,* pp. 581, 626. The reasons which the Commission advanced for its failure to make any allocation are so crucial to the disposition of the case that we quote from the opinion:

"Upon the record before us, we consider it unnecessary to make an allocation of the respondents' business as between sales for resale and direct sales. The direct sales are made to nineteen industrial customers on an interruptible basis and at prices fixed in competition with other fuels.

"According to respondents' own evidence, no capacity has ever been constructed or provided in their gas plant for these direct industrial customers. It is equally clear that deliveries are made to them only when there is available excess off-peak capacity not required by the other wholesale customers. As evidence of this fact, in 1941 the volume of gas sold to the direct industrial customers amounted to 13.2 per cent of the total system sales, whereas on the system peak day of the 1941–1942 winter the direct industrial sales constituted only 2.69 per cent of the total deliveries, due to interruptions and curtailments brought about by the necessity for meeting the wholesale customer requirements.

"Testimony of respondents' witnesses discloses that only $128,848 of the entire investment in plant (less than one-sixth of one per cent) is used exclusively in the service of the direct industrials. Moreover, the respondents themselves treat their entire business as a unit and make no segregation of costs or profits on their books as between the two classes of sales. Indeed, Panhandle Eastern's president testified quite clearly on cross-examination that any attempt to allocate would be 'theoretical,' 'unrealistic,' and 'not practical' because of the unified character of the business.

"Deliveries to the direct industrials are made only when the plant is not fully used in serving the requirements of

the wholesale business, and are curtailed or interrupted when the capacity is required by the wholesale customers. It is apparent that the incidental direct industrial business is in reality a by-product of the wholesale business, comparable to the respondents' gasoline extraction business. All parties are agreed that the expenses and revenues in connection with the sale of gasoline extracted from the natural gas should be treated as an integral part of the respondents' entire operations. Thus, it is manifest from the evidence that the direct industrial sales are purely incidental to the main or principal enterprise, viz.: the wholesale business of the respondents." 45 P. U. R. (N. S.) p. 218.

Petitioner contends that these reasons do not justify the failure of the Commission to make a formal allocation either of the property or the costs between the regulated and unregulated business. It says that the direct sales are beyond the jurisdiction of the Commission even though they are comparatively small. It asserts that the fact that the direct sales are on an interruptible basis merely emphasizes the relatively small amount of the cost of construction and operation attributable to such sales. It says that no waiver of the statutory right to have the direct sales free from regulation can be inferred and that in any event the Commission's jurisdiction cannot be enlarged by waiver. And it contends that the Commission's finding that the direct industrial business is "in reality a by-product of the wholesale business" is not supported in reason or in fact.

We agree that the Commission must make a separation of the regulated and unregulated business when it fixes the interstate wholesale rates of a company whose activities embrace both. Otherwise the profits or losses, as the case may be, of the unregulated business would be assigned to the regulated business and the Commission

would transgress the jurisdictional lines which Congress wrote into the Act.[4]  The Commission recognizes this necessity.  As it stated in *Re Cities Service Gas Co.*, 50 P. U. R. (N. S.) 65, 89: "The company's facilities and operations are devoted in part to natural gas service which is not subject to our jurisdiction.  This service consists principally of gas sales made directly to large industrial consumers.  The necessity arises, therefore, for making an allocation of costs as between the jurisdictional and non-jurisdictional sales."  The question is whether a formal allocation was necessary under the exceptional circumstances of this case.

We state the question that narrowly because the dispute in this case reflects not a rejection by the Commission of the principle of allocation but a disagreement over the propriety of the procedure followed here.

What the Commission did was to allocate to the interstate wholesale business all of the earnings from the entire business in excess of a $6\frac{1}{2}$ per cent return.  Insofar as that procedure allocated to the interstate wholesale business any earnings from the direct industrial sales in excess of $6\frac{1}{2}$ per cent, it is said to be justified by the use which the direct industrial business made of the main transmission line and its facilities.  If that was unfair, the order must be set aside.  If it was fair, no reversible error is shown.

A witness for petitioner testified at the hearing that under petitioner's allocation of costs the unregulated busi-

---

[4] Sec. 1 (b) provides:

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

ness has the use of facilities of the company without any charge. He testified that there should be a charge against the unregulated business for the use of that property. Another witness for petitioner stated that the company did not make any allocation between the regulated and unregulated business—"that is, allocation of jointly used assets"—in determining what would be charged to the unregulated sales. He stated, "It may be heresy to say so but we try to charge our nonregulated customers all the traffic will bear." It was conceded that the company attempts no allocation in the conduct of its business. The business is operated as a unit. And one of petitioner's officers testified:

"Q. That is, any attempt to allocate return, as between regulated business and unregulated business: is that what you meant was unrealistic?

"A. That is correct . . . If you are going to allocate it theoretically you should allocate it on the basis of the investment and the expenses incident to each part of the business.

"Q. But it is theoretical?

"A. That is correct.

"Q. And not practical?

"A. That is what I am trying to say."

Petitioner presented evidence showing that in the test year 91.57 per cent of its total revenues, or $16,289,045, was received from its wholesale sales and 8.43 per cent, or $1,500,527, was received from its direct industrial sales. It presented a study showing total operating expenses of about $7,900,000 (not including federal income taxes and return) and assigning $499,699 to the direct industrial sales. Thus an apparent profit of $1,000,828 before income taxes was shown for the direct industrial sales. But that study did not allocate any of the annual depreciation expense of the main transmission line ($2,238,589) to the direct industrial sales. Of the $633,270 ad valorem taxes

on transmission lines, only $1,738 applicable to the laterals used exclusively for direct industrial sales were allocated to them. None of the main transmission line operating and maintenance costs was charged to the direct industrial sales.

Petitioner recognized the unfairness of attributing to the direct industrial sales all of the apparent profit of $1,000,828. One of petitioner's witness testified:

"Q. Is there any engineering basis for a division, from an engineering standpoint?

"A. Not as an engineering matter. I do not know of any basis. As a business matter, I think there are ways in which it could be fairly decided. I think it requires some judgment based upon business experience to make a fair allocation of it but there is a little over a million dollars, some portion of which could, in all fairness, be set aside as a charge against operations on the non-regulated sales and a credit against operations on the regulated sales."

He went on to indicate what he thought a fair allocation would be:

"A. It is my opinion that that $1,000,828.98 should be divided fifty-fifty.

"Q. Why?

"A. It is just my judgment as a businessman that that would be a fair allocation of it.

"Q. You mean fifty-fifty as between regulated and non-regulated business?

"A. That is correct. I think that would be a fair allocation.

"Q. That is a business judgment estimate, not a mathematical estimate?

"A. That is right. In that way, this non-regulated business has contributed half a million dollars a year towards the reduction in cost of the regulated business

and if it does not contribute something, I do not think there is any justification for having the business."

Petitioner requested the Commission to find that it had built no capacity for its direct industrial sales which were "incremental" in nature and that it was reasonable to allocate "50 per cent of the net earnings from nonregulated sales as a credit to net earnings from regulated sales, as compensation for the temporary use of such facilities provided for regulated sales but used from time to time in transporting the gas for direct, interruptible, nonregulated sales, when not required for regulated sales." Petitioner asserts that it also requested the Commission to make a segregation of the properties used in the two classes of business. No such request, however, was included in the petition for rehearing. At that stage the petitioner merely asserted that the Commission erred (1) in taking the proceeds from the direct industrial sales into consideration in determining the amount of its profits and in ordering the rate reduction; and (2) in failing reasonably to allocate petitioner's earnings between regulated sales and unregulated sales. That precludes an attack in the courts on the Commission's order for failure to make a segregation of property. For § 19 (b) of the Act provides that "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." No such excuse has been tendered.

On these facts we cannot say that the Commission transgressed the jurisdictional requirements of the Act when it failed to make a formal allocation of costs or of property. All agreed that an allocation on the basis of investment or costs would be impractical. All agreed that some division of the apparent profit from the direct industrial business had to be made. All agreed that the fair division was a matter of judgment, not mathematics.

In view of those concessions by petitioner, the manner in which it conducted its business, its failure to insist on a segregation of property in its petition for rehearing, and its own failure to keep accounts which reflected a segregation of the properties or an allocation of costs among the two classes of business, we do not think it can now be asserted that the Commission erred in forsaking a formula and using its informed judgment instead.

We do not mean to imply that such concessions would warrant a departure of the Commission from the statutory scheme of regulation. The issue is a much narrower one. The Commission did not undertake to fix industrial rates. The Commission, as was its duty, merely determined what earnings were properly allocable to the unregulated business. Petitioner disagrees with the result. The use of a formula for an allocation of costs or a segregation of property might or might not have been more favorable to petitioner. But once the use of such a formula is waived or is conceded to be impractical or theoretical, there must be some discretion in the Commission to make that determination through the exercise of its informed judgment. We cannot say that the Commission abused its discretion by concluding on the basis of the special circumstances here presented that earnings of the entire business in excess of a $6\frac{1}{2}$ per cent return should be allocated to the interstate wholesale business. The small investment in the direct industrial business, the incremental nature of it, the extent of the interruptions in service to the direct industrial customers, the manner in which the management has treated it afford a basis for the refusal of the Commission to credit it with a larger share of the earnings than $6\frac{1}{2}$ per cent.

The Commission, while it lacks authority to fix rates for direct industrial sales, may take those rates into consideration when it fixes the rates for interstate wholesale sales which are subject to its jurisdiction. For § 5 (a) provides

that whenever the Commission "shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, *or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential,* the Commission shall determine the just and reasonable rate." (Italics added.) It is clear that contracts covering direct industrial sales come within that italicized clause of § 5 (a).[5] The industrial rates in force here produce revenues of $1,500,527 with expenses of $499,699 which, according to petitioner, result in earnings of $1,000,828 before income taxes. That is an apparent profit of more than 200 per cent. It is a fairly obvious indication that the regulated business is being saddled with costs which in fairness should be borne by direct industrial sales. That is an extremely relevant consideration for the Commission to take into account when it determines what costs are fairly attributable to each business and what the resultant rate for the wholesale business should be. Sec. 5 (a) does not of course give the Commission authority to disregard the jurisdictional lines which Congress has drawn between interstate wholesale sales and direct industrial sales so as to level the profits between the two classes of business. But § 5 (a) reinforces our conclusion that in the exceptional circumstances of this case the Commission did not exceed the limits of its discretion when it allocated to the regulated business

---

[5] There must be filed with the Commission not only schedules of rates subject to the jurisdiction of the Commission but "the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services." § 4 (c). By Rule 54.30 the Commission requires the filing with it of all contracts for direct industrial sales involving sales in excess of 100,000 Mcf per year. See 8 Fed. Reg. 16101.

all excess earnings of the entire business over 6½ per cent.

*Producing and Gathering Facilities.* The Commission constructed a rate base on the actual legitimate cost of petitioner's property in service on December 31, 1941, which it found to be $78,814,292. It deducted $12,596,987 for accrued depreciation, depletion and amortization. It added $920,000 for working capital. The result was a rate base of $67,137,305 on which the Commission allowed a return of 6½ per cent which it found to be "fair and liberal." It included in the rate base petitioner's producing properties [6] and gathering facilities. Petitioner claims that was error. It contends that it was incumbent on the Commission to determine the field price or actual field value of natural gas in the areas in which petitioner produces gas, to eliminate petitioner's leaseholds and producing and gathering facilities from the rate base, to disallow expenses of gathering and production, and to allow petitioner as an expense item the field price or actual field value for all gas produced by it and taken into the pipeline system. Evidence was offered to show what the market price or actual field value of the gas was. The argument is that the procedure followed by the Commission extends its jurisdiction over "the production or gathering of natural gas" contrary to the mandate of § 1 (b).[7] Petitioner suggests moreover that if its leaseholds are to be included in the rate base they should not be included at cost but at what petitioner claims to be the market value.[8]

---

[6] Petitioner produces approximately 50 per cent of the gas which it transports and sells, the remainder being purchased. The payments for gas purchased were allowed by the Commission as an operating expense.

[7] See note 4, *supra.*

[8] The market value is alleged to be about $8,400,000 as compared with some $955,000 which the Commission found to be the actual legitimate cost.

This phase of the case is controlled by *Canadian River Gas Co.* v. *Federal Power Commission, supra.* We need not repeat what we said there. It is clear that the value of producing properties and gathering facilities is affected whenever rates are fixed. That is inevitably true whether the leaseholds are put into the rate base or whether as petitioner urges the gas is valued as a commodity. That result is not avoided unless Congress puts a floor under production properties and gathering facilities of natural gas companies and fixes a minimum return on them. That Congress has not done. As Judge Sanborn aptly stated in the opinion of the Circuit Court of Appeals: "If there is an infirmity in the Commission's determination of the amount which should be included in the rate base as the cost or value of such facilities, we think the infirmity arises from the method used in making the valuation, and not from any lack of jurisdiction." 143 F. 2d 495. Petitioner, moreover, failed to object in its application for rehearing before the Commission to the inclusion of its producing properties and gathering facilities in the rate base. It is accordingly precluded by § 19 (b) of the Act from attacking the order of the Commission on the ground that they are included.

*Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U. S. 591, holds that the Commission is not bound to use any single formula for the fixing of rates. It is not precluded from using actual legitimate cost as it did here. The question on review is not the method of valuation which was used but the end result obtained since the issue is whether the rate fixed is "just and reasonable." § 5. In the present case the 6½ per cent return allowed by the Commission will permit petitioner to earn $4,363,925 annually on the basis of the test year after meeting all operating expenses which include depreciation, exploratory and development costs, and federal income taxes. The cost of servicing petitioner's long-term debt is $957,786 or

2.88 per cent. The cost of meeting the requirements of the preferred stock is $939,000 or 5.8 per cent. That leaves $2,467,139 for $20,184,175 of common stock—a return of 12 per cent. The return would be 9 per cent figured on the basis of common stock and surplus of $27,650,000. We are unable to say on these undisputed facts that the return is not commensurate with the risks, that confidence in petitioner's financial integrity has been impaired, or that petitioner's ability to attract capital, to maintain its credit, and to operate successfully and efficiently has been impeded.[9] See *Federal Power Commission* v. *Hope Natural Gas Co., supra,* p. 603.

*Affirmed.*

Mr. Chief Justice Stone, concurring.

Mr. Justice Roberts, Mr. Justice Reed, Mr. Justice Frankfurter and I concur for the following reasons only.

Petitioners did not raise objections in their application for rehearing to the Commission to the inclusion of their

---

[9] The Commission stated on this phase of the case:

"The evidence discloses that the respondents' business is exceptionally free from serious business hazards. The gas supply is assured for at least thirty to thirty-five more years. We have made ample provision in the annual depreciation allowance for the restoration of the capital investment in the property over the claimed life of the gas supply. The respondents' markets are rapidly expanding and embrace the large metropolitan area of Detroit, which alone takes 40 per cent of the entire output under a long-term contract. Panhandle Eastern's president testified that the demand for service is so great that within the next year the respondents will be called upon to sell every cubic foot of gas that can possibly be delivered through the lines, and that the capacity factor will increase from 70 per cent to 90 per cent.

"It is likewise apparent from respondents' own evidence that Panhandle Eastern has been able to raise considerable capital at low cost. Only recently it successfully completed a financing program at remarkably low rates which resulted in a substantial reduction in its annual

producing and gathering facilities in the rate base. By § 19 (b) of the Natural Gas Act "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." No reason appears for the failure of petitioners here to make objection on rehearing to the inclusion of the production and gathering facilities in the rate base.

---

cost of capital. In February, 1941, Panhandle Eastern sold $18,250,000 of first mortgage and first lien bonds and $5,000,000 of serial notes at an average annual interest cost of 2.74 per cent. In February, 1942, it sold an additional $10,000,000 of first mortgage bonds at an interest cost of 3.13 per cent and $15,000,000 of preferred stock at a cost of 5.86 per cent. After the financing, Panhandle Eastern's annual cost of long-term debt was 2.88 per cent and preferred stock was 5.87 per cent, a combined annual cost of only 3.85 per cent for these securities.

"Panhandle Eastern has earned an average of 10.64 per cent on its net investment over the past five years, and Michigan Gas an average of 8.5 per cent during approximately the same period." 45 P. U. R. (N. S.) p. 215.