**MICHIGAN CONSOLIDATED GAS COMPANY, Appellant,**

v.

**PANHANDLE EASTERN PIPE LINE COMPANY, Appellee.**

**PANHANDLE EASTERN PIPE LINE COMPANY, Appellant,**

v.

**MICHIGAN CONSOLIDATED GAS COMPANY, Appellee.**

Nos. 12200, 12201.

United States Court of Appeals
Sixth Circuit.

Aug. 1, 1955.

As Modified on Denial of Rehearing
Oct. 6, 1955.

---

3. 45 U.S.C.A. § 228j(b) (4) and § 362(*l*).

Walter M. Meek, Detroit, Mich., Clifton G. Dyer, Walter M. Meek, A. D. Ruegsegger, Dyer, Angell & Meek, Detroit,

Mich., on the brief, for Michigan Consolidated Gas Co.

Henry C. Bogle, Detroit, Mich., Henry C. Bogle, Carson C. Grunewald, Detroit, Mich., Steptoe & Johnson, Washington, D. C., John S. L. Yost, Robert M. Morgenthau, New York City, on the brief, for Panhandle Eastern Pipe Line Co.

Before ALLEN, MILLER and STEWART, Circuit Judges.

ALLEN, Circuit Judge.

These consolidated appeals attack a judgment of the District Court in an action filed by Panhandle Eastern Pipe Line Company, hereinafter called "Panhandle," against Michigan Consolidated Gas Company, hereinafter called "Consolidated." Panhandle is a producer of natural gas which operates a pipe line system from Texas to Michigan, and Consolidated is a utility distributing natural gas in Detroit and the Detroit metropolitan area, and Western Michigan. In appeal 12201 Panhandle attacks that part of the judgment denying Panhandle recovery on Causes of Action or Counts I, II, III, V, and VII of its complaint and supplemental complaints and denying interest prior to the date of the entry of judgment on recovery granted to Panhandle in the amount claimed in Counts IV and VI of the complaint. In appeal 12200 Consolidated appeals from that part of the judgment which grants Panhandle recovery of $601,354.39 against Consolidated, together with interest from the date of entry of judgment. Consolidated also appeals from the judgment that Consolidated take nothing by its counterclaim.

In 1935 Panhandle and Consolidated entered into a contract which, with later amendments, provided that Consolidated should buy all of its natural gas from Panhandle, but not in excess of 125,000,-000 cubic feet per day. After the enactment of the Natural Gas Act of June 21, 1938, 15 U.S.C. Sections 717, 717a et seq., 15 U.S.C.A. §§ 717, 717a et seq., this contract and the amendments thereto were filed and became effective as supplements to Rate Schedule FPC No. 12. On September 23, 1942, the Federal Power Commission, hereinafter called the "Commission," after various hearings, entered an order requiring Panhandle and certain subsidiaries to reduce their rates and charges and file new schedules embodying this reduction. On April 2, 1945, the United States Supreme Court affirmed this order. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241. On October 22, 1945, Panhandle tendered for filing supplements to its previous rate schedules which were approved by the Commission November 2, 1945, in an order making such rates effective on and after November 1, 1942. Among the rates approved was Supplement No. 5 to Rate Schedule FPC No. 12 containing Rate Schedule Gd-1 which governs "Deliveries to Utilities-Firm, Resale." This rate schedule, which is the basis of the principal question presented in appeal 12201, is printed in the margin.[1]

In 1947 Panhandle complained to the Commission that Consolidated, which at the time controlled the physical equipment for delivery in Detroit, was taking

---

1. Rate Schedule Gd-1
    Deliveries to Utilities-Firm, Resale
    Applicable
    (a) This rate shall apply to all natural gas purchased on a firm basis by the Utility for resale to domestic and other customers, except such natural gas as the Utility shall purchase, under any other rate schedule of the Company available to the Utility.
    (b) Subsequent to October 1, 1945, the Utility, at its option, may purchase gas under this rate schedule for resale to any individual customer whose present, or estimated, annual use of gas is less than one million two hundred thousand (1,-200,000) therms and whose gas requirements were purchased by the Utility from the Company on an interruptible basis prior to October 1, 1945.
    (c) This rate schedule shall not apply to gas purchased by the Utility from the Company for resale to any individual customer whose present, or estimated, annual use of gas exceeds one million two hundred thousand (1,200,000)

gas in violation of the 1,200,000 therm limitation of Rate Schedule Gd–1 Applicable (c). Panhandle requested that it be permitted, in accordance with the contract of August 31, 1935, to examine Consolidated's books and records in respect of sales to individual customers covered by the 1,200,000 therm limitation Gd–1 Applicable (c) but its requests were refused. On August 8, 1947, the Commission in a letter charged that Consolidated was receiving gas from Panhandle contrary to the provisions of Gd–1 Applicable (c). Consolidated replied that with reference to the resale of gas received from Panhandle it was not subject to regulation by the Commission. On August 16, 1947, the Commission embodied in specific findings its charge that Consolidated was violating Gd–1 Applicable (c). On August 19, 1947, the Commission filed an action in the Federal Court for the Eastern District of Michigan against Panhandle and Consolidated, praying for temporary and permanent injunction against the resale practices in question. Within a week this suit was dismissed without prejudice. On September 8, 1947, Consolidated filed an application for rehearing on the order of November 2, 1945, and for vacation of the Commission's findings of August 16, 1947. As to the order of November 2, 1945, the application was held to be untimely filed and the Commission dismissed the application. An appeal taken from this order was dismissed by the Court of Appeals for the District of Columbia, Michigan Consolidated Gas Co. v. Federal Power Commission, 83 U.S.App.D.C. 395, 167 F.2d 264. In an order entered December 12, 1946, the Commission, as a result of hearings and of voluntary agreement reached by Panhandle and certain distributing utilities, established emergency curtailment of service under rules and regulations which were continued in force by subsequent orders until November 25, 1947, and later extended until June 1, 1948. On July 17, 1948, the Commission filed its Opinion No. 166 and an order of the same date, which provided for distribution of definite amounts of gas to The Ohio Fuel Gas Company until April 30, 1949, and also that "of such volumes of natural gas as may be available after making deliveries to all of its other customers east of its Edgerton [Indiana] Compressor Station" Panhandle should make deliveries to Consolidated and to Michigan Gas Storage in certain percentages which are printed in the margin.[2] The order also provided that Panhandle install

---

therms, unless such gas requirements were purchased by the Utility from the Company on a firm basis prior to October 1, 1945.

Rate

(a) For all gas delivered hereunder, each month, in Indiana, Ohio and Michigan:

for that number of therms herein defined as "base load" one and eighty-five hundredths (1.85) cents per therm.

for that number of therms in excess of "base load" two and six-tenths (2.6) cents per therm.

(b) Determination of "base load" for each billing month.

(1) The "daily base load" applicable to each period of twelve (12) billing months shall be the average number of therms delivered per day during the four (4) consecutive months of June to September, both inclusive, immediately preceding such period. Provided, however, if the Company, due to its inability or on its own initiative, fails to make delivery of normal requirements or agreed amounts, such curtailed deliveries and the days on which made shall be excluded in the determination of "daily base load."

(2) The daily base load shall be determined once each year as soon after October 1st as practicable, and the daily base load so determined shall be effective for the immediately succeeding twelve (12) months' period, beginning with the October billing month.

(3) The "base load" shall be the daily base load multiplied by the number of days in the billing month or shall be the total number of therms delivered, whichever is less.

2. Panhandle shall deliver to Michigan Consolidated 52% and to Michigan Gas Storage 48% of such available volumes of natural gas until such date as the total volumes delivered to both such companies from and after May 15, 1948, shall have reached a proportion of 55.6% to

physical means of controlling the delivery of natural gas to Consolidated at Detroit and deliver such gas to Consolidated at Detroit without restriction as to locality of resale.

August 18, 1948, Consolidated filed an action for specific performance of its contract of August 31, 1935, as amended, praying that the court require installation by Panhandle of additional facilities at the Edgerton Compressor Station and compel Panhandle to operate so as to insure as near as reasonably possible a continuous supply of gas in the volume of 125,000,000 cubic feet per day. This case was dismissed by the District Court upon the ground that the controversy was exclusively within the jurisdiction of the Commission. This court affirmed the judgment in Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 173 F.2d 784. In Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 6 Cir., 177 F.2d 942, an action for declaratory judgment involving similar issues, this court reversed a judgment of the District Court granting a temporary injunction to prevent curtailment of gas delivery from the pipe line to the distributor.

On July 30, 1948, Panhandle filed the complaint herein, charging in Counts I, II, III and V that by reason of alleged violations of the 1,200,000 therm limitation in Rate Schedule Gd–1 Applicable (c) Consolidated had not paid the full amount owing for gas delivered during the billing periods, October 1, 1946, through September 30, 1947, and October 1, 1947, through September 30, 1948. It claimed that the compensation due Panhandle for the periods involved should be computed by excluding from the "base load" amounts of gas taken in excess of the 1,200,000 therm limitation and that under Rate Schedule Gd–1 Rate (a) the 2.6 rate instead of the 1.85 rate should be charged for the number of therms delivered in excess of the "base load." Consolidated had paid at the 1.85 rate for these amounts of gas delivered. Counts I, II, III, and V prayed for judgment for the balance claimed to be due on such amounts as computed at the 2.6 rate, including interest at 6% per annum from the date of the bills rendered.

In Counts IV and VI Panhandle set up that $601,354.39 plus interest owing to Panhandle for gas delivered to Consolidated had been deducted and withheld by Consolidated as claimed setoff for gas manufactured by Consolidated in order to fill alleged deficiencies in delivery during the period from July 23, 1948, through October, 1948. Consolidated admitted that it had not paid for gas delivered by Panhandle, but claimed that under the amended contract of August 31, 1935, and also under the Commission's order of July 17, 1948, Panhandle was liable to reimburse it for the cost of manufacturing gas during the period of deficiency deliveries. In Count VII of the complaint Panhandle claimed that Consolidated had unlawfully inflated the "base load" by excluding from its computation of the daily "base load" certain days in July, August, and September of 1948, when plaintiff delivered less than 125,000,000 cubic feet per day. These deficiencies were in conformity with the Commission's order of July 17, 1948. Panhandle asserted that by applying the correct "base load" computation a bill of $157,541.16 with interest was due to Panhandle.

Consolidated filed a counterclaim, claiming reimbursement for the cost of manufacturing gas for the period of deficiency deliveries, including certain days in December of 1946, in January and February of 1947, in January of 1948, in August, September, and October of 1948. The total amount claimed in the second

Michigan Consolidated and 44.4% to Michigan Gas Storage; and, from such date until October 31, 1948, such volumes of gas as may be available for delivery to these two companies shall be delivered by Panhandle on a daily basis in the pro-

portion of 55.6% to Michigan Consolidated at Detroit and 44.4% to Michigan Gas Storage. Any variation in the daily delivery to either customer from the aforesaid percentages shall be adjusted within seven days; or; * * *

amendment to the counterclaim was $1,-500,000. The District Court, 117 F. Supp. 551, gave judgment for Consolidated on Counts I, II, III, and V, for Panhandle on Counts IV and VI, refused the interest prayed for by Panhandle from the date of bills rendered prior to the entry of judgment, rendered judgment for Consolidated on Count VII and rendered judgment against Consolidated on its counterclaim.

■ Consolidated contends that under the Natural Gas Act, 15 U.S.C., Section 717(b), 15 U.S.C.A. § 717(b), the Commission had no power to adopt or approve Gd–1 Applicable (c) because it prohibits the resale of gas to new large industrial customers of the local utility. Section Gd–1 Applicable (c) imposes no prohibition on sale to domestic consumers and no limitation on the use of gas resold to domestic consumers. What Gd–1 Applicable (c) provides is that certain rates applicable between Panhandle and Consolidated shall not apply in the circumstances defined therein. The District Court decided correctly that, while Gd–1 Applicable (c) may indirectly affect local distribution of gas by Consolidated, its primary purpose is the application of the provision to an interstate transaction, the purchase of gas by Consolidated on a firm basis from Panhandle, to interstate rather than to local sales. Cf. Ambassador, Inc., v. United States, 325 U.S. 317, 65 S.Ct. 1151, 89 L.Ed. 1637. The contention on this point must be overruled.

■■ The judgment as to Counts I, II, III, and V must be affirmed for the reason as held by the District Court, that Gd–1 Applicable (c) has no legal effect. The Commission did not take the required statutory steps to put the terms and conditions of service established in Gd–1 Applicable (c) into effect so as to supersede the contractual provisions of August 31, 1935, as amended, binding on both Panhandle and Consolidated. It is conceded by the parties and the Commission decided that under the contract as amended Consolidated has a right to receive from Panhandle, on a firm basis, up to 125,000,000 cubic feet of gas per day at specified rates. But Panhandle claims that Gd–1 Applicable (c), if effective, limits this right. While under 15 U.S.C., Section 717d(a), 15 U.S.C.A. § 717d(a), the Commission had authority to establish limitations modifying the contract between Panhandle and Consolidated as an incident to its power to regulate rates, Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., supra, Section 717d(a) requires that such action be based upon an express finding that the contractual provision in question is unjust, unreasonable, unduly discriminatory, or preferential. Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037. In its order of September 23, 1942, the Commission, having found under Section 717d(a) that the rates and charges theretofore made, demanded, and received by Panhandle were unjust, unreasonable, and excessive, ordered Panhandle to file new schedules of rates and charges to reflect the reduction ordered. Panhandle framed the revised schedules and after full hearing the Commission approved and made these rates effective by its order of November 2, 1945. No findings were included in the order of September 23, 1942, nor in the order of November 2, 1945, to the effect that other practices or provisions of the contract of August 31, 1935, than the rate provisions were unjust, unreasonable, unduly discriminatory, or preferential. Panhandle, however, urges that the revised schedules put into effect November 2, 1945, were filed, not by the Commission but by Panhandle, under Section 717c(d). When a utility files new or amended rates under this section, Panhandle contends the findings essential under Section 717d (a) are not required.

■ Assuming but not deciding that findings are not necessary under Section 717c(d), (Cf. Administrative Procedure Act, Title 5, § 1007[b], 5 U.S.C.A. § 1007[b]), we think Panhandle's contention cannot be sustained. The fact that the Commission, instead of direct-

ly establishing new rates, ordered Panhandle to frame new rates in accordance with its order of September 23, 1942, is not decisive. When the Commission ordered Panhandle to submit new rates, Section 717d(a) necessarily applied. The rates were filed on behalf of the Commission and were adopted by the Commission as its own in the order of November 2, 1945. This in legal effect was the equivalent of rates initiated by the Commission.

■ The advantage, in a proceeding covering transactions in eight states, of being able to order the utility to frame and submit new rates, is obvious. But to hold, as contended here, that the rates as a matter of law are Panhandle's subject to the provisions of 717c(d) and not the Commission's controlled by Section 717d (a) (assuming that findings are not necessary as to rate schedules filed by a utility under Section 717c[d]) would enable the Commission by the simple device of ordering a utility to file rate schedules to dispense with the findings essential under the statute. The Commission is authorized not only to modify contractual obligations, but also to impose reasonable conditions as to service. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, supra, 324 U.S. 647, 65 S. Ct. 827; Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., supra, 173 F.2d 789. However, express findings must be entered, both with reference to change of rates and to new provisions for conditions of service. Colorado Interstate Gas Co. v. Federal Power Commission, 10 Cir., 142 F.2d 943, 954; Atchison, Topeka & Santa Fe Railway Co. v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382; Colorado-Wyoming Gas Co. v. Federal Power Commission, 324 U.S. 626, 634, 65 S.Ct. 850, 89 L.Ed. 1235. The very flexibility of operation which is afforded in administrative proceedings makes all the more essential a requirement of express findings for the protection of the public and also for informed consideration of these cases coming up for review by the courts.

■ Panhandle also contends that, if the new schedules of Gd–1 Applicable (c) could not supersede or modify the provisions in the amended contract of August 31, 1935, unless such provisions were specifically found to be unjust, unreasonable, unduly discriminatory, or preferential, the Commission's order of November 2, 1945, supplied such a finding. In that order the Commission specifically found that the rate schedules tendered by Panhandle were in substantial compliance with the order of September 23, 1942. Panhandle argues that this constitutes a finding that these new provisions covering terms and conditions of service as well as rates were just and reasonable and not excessive.

This contention also has no merit. The findings must be express, precise, and clear. The order and findings of November 2, 1945, as well as of September 23, 1942, covered rates and charges but not terms and conditions of service. The two subjects are not identical and they are covered by separate paragraphs of the statute. Section 717c(a) provides that "All rates and charges made, demanded, or received * * * shall be just and reasonable * * *." Section 717d provides that, in case any contract or any practice affecting such rate or charge is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable practice or contract to be thereafter observed. This provision applies to terms and conditions of service. The statute contains no express definition of "rates and charges" but each of the two words bears a dollar and cents connotation. Webster's New International Dictionary, 1955. Section 717c carries out that connotation for it contemplates that the rates and charges in question be "received." While Gd–1 Rate (a) fixes rates and charges which may be "received," 1.85 or 2.6 as the case may be, Gd–1 Applicable (c) describes nothing that can be received and fixes no rates and charges.

What Panhandle in effect contends is that a paragraph of a rate schedule which fixes no rates and charges but fixes terms and conditions of service, namely, Gd–1 Applicable (c), is validated by an order which relates only to rates and charges. This contention cannot be sustained under the statute and the applicable decisions.

Moreover, during the hearings upon the new schedules submitted by Panhandle, including Gd–1 Applicable (c), the Commission at no point indicated that terms of resale by the utility to large industrial consumers were under consideration. In fact, it indicated the contrary, repeatedly stating in various orders that only rates were being considered. Thus, on September 14, 1945, the Commission ordered that the hearing on Panhandle's proposed new schedule "shall be limited to matters relating to proper rates which will comply with the Commission's interim order of September 23, 1942. The Commission reserves all other matters for later consideration." In the order of November 2, 1945, approving the rates in the proposed schedule, the Commission states that the preceding hearing "was limited to matters relative to proper rates * * *." On August 6, 1946, in an order for a hearing regarding terms and conditions of service the Commission stated:

"(d) The public hearing held pursuant to the Commission's order of September 14, 1945, was not concerned with matters relating to terms and conditions of service embodied in the rate schedules under consideration * * *."

The fact, then, that the Commission in its order of November 2, 1945, states that the rates offered by Panhandle are in substantial compliance with its order of September 23, 1942, does not constitute a finding that provisions or practices concerning terms and conditions of service are included in the rates which had previously been found to be unjust, unduly unreasonable, discriminatory, and preferential, nor that new provisions covering terms and conditions of service

are determined to be "just and reasonable". Section 717d. Since the order of 1942 did not refer to nor cover terms and conditions of service, the approval of the rates in the order of November 2, 1945, as being in full compliance with the order of 1942 does not cover and validate the provisions as to resale in Gd–1 Applicable (c). Moreover, the lack of essential findings on this point was not cured by the Commission's letter of August 8, 1947. The failure of the Commission in its order of November 2, 1945, to distinguish between rates and charges and terms and conditions of service detracted from the definiteness of that order and lends support to the District Court's conclusion that Consolidated may thereby have been misled and prevented from filing timely application for rehearing and timely appeal from the order of November 2, 1945.

This consideration is not conclusive. The decisive point is that the District Court's holding that Gd–1 Applicable (c) had no legal effect was correct under the statute and the pertinent adjudications. Colorado-Wyoming Gas Co. v. Federal Power Commission, supra, 324 U.S. 634, 65 S.Ct. 854; Atchison, Topeka & Santa Fe Ry. Co. v. United States, supra, 295 U.S. 201, 202, 55 S.Ct. 752. As Panhandle's obligation to deliver limited amounts of gas for resale under the new schedules was not based upon the essential statutory findings, the order was not effective to supersede the contractual obligations of the amended agreement of 1935 between Panhandle and Consolidated and Panhandle had no cause of action under Gd–1 Applicable (c). Since Counts I, II, III, and V are all based upon the alleged violation of Gd–1 Applicable (c), the judgment of the District Court on these four counts must be affirmed.

■ In Count VII Panhandle avers that Consolidated unlawfully inflated the daily "base load" applicable to sales by Panhandle for the period from October 1, 1948, through September 30, 1949, by excluding from its computation of the daily "base load" the days in July, August, and September, 1948, when Pan-

handle delivered less than 125,000,000 cubic feet per day to Consolidated. The District Court held that these days should be excluded in the "base load" computation upon the ground that the Commission's order of November 2, 1945, which approved and adopted RATE SCHEDULE Gd–1, provided for such exclusion. This part of the judgment was correct and is affirmed.

On Counts IV and VI the court rendered judgment for Panhandle, denying interest to Panhandle, however, prior to the date of the entry of judgment. This ruling as to interest is in conformity with the amended contract of August 31, 1935, and is correct.

The amounts sued for in these counts are admitted to be due for gas delivered by Panhandle to Consolidated, but were withheld by Consolidated as claimed setoff for Panhandle's deficiencies in deliveries from July 23, 1948, through October 31, 1948, because of which Consolidated says it was compelled to manufacture gas at increased cost in order to supply its customers. The setoff is asserted as a defense to Counts IV and VI. Also an affirmative cause of action based on deficiency deliveries by Panhandle to Consolidated for separate periods from December 19, 1946, to October 31, 1948, is asserted in Consolidated's counterclaim.

Consolidated contends (1) that in view of the contract of August 31, 1935, as amended, particularly Articles X, XV, and XVIII, Panhandle is liable for all shortages below the 125,000,000 cubic feet per day provided in the contract if Panhandle was negligent or failed to use diligence so as to prevent such shortages; (2) that under the Commission's order of July 17, 1948, if Panhandle made available to its firm customers east of Edgerton less than the delivery capacity of its system east of Edgerton, it violated the Commission's order of July 17, 1948, and is liable under Paragraph 4 of Article XVIII of the contract of August 31, 1935, to reimburse Consolidated for the expense caused by such shortages.

The principal provisions of the amended contract of August 31, 1935, which Consolidated claims were still in force after July 17, 1948, and establish Panhandle's liability for deferred deliveries, are in brief as follows: Under Article X Panhandle agreed to construct pipe lines and to hold or have available gas acreage and production facilities sufficient to supply Consolidated and its other customers with a continuous supply of gas. Under Article XVIII if Panhandle failed to deliver gas in the volume agreed, it was required, with an exception not material here, to reimburse Consolidated for the expense of manufacture or purchase to remedy the deficiency.

The order of July 17, 1948, was entered in various consolidated proceedings covering transactions in eight states. Among other things it authorized curtailing deliveries by Panhandle to Consolidated and Michigan Gas Storage. In its Opinion 166 filed July 17, 1948, in conformity to which the order of July 17, 1948, was entered, the Commission declared:

"We find that the practice of Panhandle in permitting Consolidated to take 125,000 Mcf a day, while delivering to Gas Storage something less than the quantity to which it is entitled under its gas purchase contract, has the effect of granting to Consolidated an undue preference and advantage, and subjects Gas Storage to undue prejudice and disadvantage."

The order of July 17, 1948, was based on proper hearings and express findings and, as found by the District Court, was clearly valid in the modification which it imposed upon Panhandle's contractual obligation to deliver 125,000,000 cubic feet of gas per day to Consolidated. The order also freed Consolidated from any restriction as to locality of resale and permitted Panhandle to establish physical controls upon delivery of gas in Detroit. However, the order of July 17, 1948, made no findings as to other provisions of the contract between Panhandle and

Consolidated excepting those which relate to the amount, volume, and method of delivery described above. Neither the order nor Opinion 166 in terms modified or considered Sections X, XV, or XVIII of the amended contract of August 31, 1935. In its Opinion 166–A issued August 25, 1948, the Commission declared:

"The Commission's order of July 17, 1948, which prescribes the manner in which Panhandle shall make deliveries of natural gas to Michigan Consolidated and Michigan Gas Storage Company effectively modifies all provisions of Panhandle's Rate Schedule FPC No. 12, and supplements thereto which may be inconsistent with the provisions of that order including Panhandle's obligation to deliver 125,000 Mcf per day and including Paragraph 4 of Article XVIII of the contract of August 31, 1935 (Panhandle's Rate Schedule FPC No. 12), and Supplement No. 11 to such rate schedule accepted for filing under Commission order of July 23, 1948, likewise modifies any provision in such rate schedule inconsistent therewith."

Since Article XVIII was not mentioned in the order of July 17, 1948, this interpretation by the Commission made in its Opinion 166–A has no legal effect. Atchison, Topeka & Santa Fe Railway Co. v. United States, supra. The Commission is not authorized to interpret the legal effect of its own orders or alleged violations thereof, Cf. Michigan Consolidated Gas Co. v. Federal Power Commission, 83 U.S.App.D.C. 395, 167 Fed.2d 264, nor to extend their legal scope.

The order did effectively supersede Panhandle's contractual obligation to deliver 125,000,000 cubic feet of gas per day during the period described therein, namely, July 17, 1948, to October 31, 1948. The order affected and curtailed the amount of delivery but did not alter liability of Panhandle under Article XVIII of the contract of August 31, 1935,

for damages caused by wrongful deficiencies in delivery.

■ Concerning Consolidated's contention that the shortage of gas delivered to Consolidated was caused by Panhandle's neglect or deliberate failure to provide itself with adequate facilities at the Edgerton Station as required by the contract, we think that the District Court properly declined to assume jurisdiction. The problems described under these particular allegations in Consolidated's answer and counterclaim involved, as the District Court observed, "intricate problems of service as between different users and different geographical sections" and required for their decision the technical understanding and expert knowledge of the Commission. The transactions covered by certain of the Commission's orders included in the record and directly relevant involve eight states and great metropolitan areas. The problems of changing industrial conditions and growing needs for natural gas both territorially and otherwise are so extensive they do not lend themselves in the first instance to hearing before a court and require the expertise of the Commission. We think this is true, although this case presents actions for damages and not an action for specific performance as in Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., supra.

■ However, we differ from the District Court's conclusion that Consolidated has no defense to Counts IV and VI and no cause of action under the Commission's order of July 17, 1948, and that the District Court has no jurisdiction of that question.

Consideration as to whether Panhandle has not complied with the order of the Commission and has breached the provision for reimbursement embodied in Article XVIII of the contract of August 31, 1935, presents the usual questions of law and fact which a court is authorized to handle and which require no special expert knowledge. The exercise of the ad-

ministrative power and discretion of the Commission is in no way involved. Cf. Pennsylvania Railroad Co. v. Puritan Coal Mining Co., 237 U.S. 121, 35 S.Ct. 484, 59 L.Ed. 867; Great Northern Railway Co. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943. Moreover, a determination of these questions by the court could result in no undue preference as the Commission in its order of July 17, 1948, has fixed the priorities to be followed.

Under the order of July 17, 1948, construed with Article XVIII of the contract of August 31, 1935, still in force during the period involved, Consolidated has a valid cause of action against Panhandle. The deficiencies in delivery are admitted and the asserted liability of Panhandle for reimbursement of expenses of manufacture exists if the order of July 17, 1948, was violated by Panhandle.

This order required Panhandle to make deliveries to Consolidated at Detroit and to Michigan Gas Storage, both of which were firm customers, entitled to uninterrupted deliveries for the emergency period of "such volumes of natural gas as may be available after making deliveries to all of its other customers east of its Edgerton Compressor Station" in certain percentages not here material. Panhandle claims that since it made deliveries in the specific percentages to Consolidated and Gas Storage it complied with the order and Consolidated conceded at the trial that the percentages were followed in the deliveries. This order was in conformity with FPC Opinion No. 166 issued July 17, 1948, in which the Commission stated, "since the station capacity is based upon estimates similar to those which have frequently in the past proved substantially below performance, we are unwilling to make a finding with respect to the availability east of Edgerton Station of specific volumes of gas. Rather we believe that Panhandle will exert every reasonable effort to deliver through that station the largest volumes of gas possible; and we shall expect that, if necessary to do so, and to the extent required, Panhandle will make appropriate curtailment of interruptible deliveries pursuant to the provisions of effective tariffs and contracts."

We construe the order as granting to Consolidated and Michigan Gas Storage priorities over interruptible customers west of Edgerton in the volume of gas to be delivered by Panhandle at Edgerton up to the capacity of that station. It follows that, if Panhandle failed to deliver to Consolidated and Gas Storage in the percentages established and up to the capacity of Edgerton Station such volumes of natural gas as were available after making deliveries to Panhandle's other customers east of Edgerton Station, Panhandle is liable under Article XVIII of the contract of August 31, 1935, to reimburse Consolidated for such deficiencies. The withholding of amounts adequate for reimbursement, if the right to reimbursement is established, is expressly authorized by the contract and constitutes a valid defense to Counts IV and VI.

Consolidated also asserts a cause of action in its counterclaim for additional amounts which it claims to have expended due to the deficient deliveries of Panhandle during this period from December 19, 1946, to October 31, 1948. The deficiencies arising in 1946 and 1947 were under the emergency orders in force during these years, which specified definite standards of curtailment in delivery.

The District Court held that it had no jurisdiction to consider this question. For the reasons stated above we think this was error.

Having ruled that it had no jurisdiction to decide Consolidated's claim of set-off and of affirmative recovery under the counterclaim the District Court denied two motions for discovery filed by Consolidated. The court thus refused to permit Consolidated, among other things, to prove the capacity of the Edgerton Station and to prove how much interruptible gas was delivered west of Edgerton by Panhandle during the emergency period out of the volume which was properly

available at the Edgerton Station. Panhandle's records showed that the deliveries of the Edgerton Station often exceeded 285,000,000 cubic feet per day. The Commission in its Opinion 166 stated that 270,000,000 cubic feet of gas per day was not the capacity of Edgerton and that a substantially larger volume of gas could be delivered through that compressor station. This conclusion is amply sustained by the record. On May 31, 1948, 296,000,000 cubic feet were delivered through Edgerton. This "abnormal" delivery was ascribed by Panhandle's witness "to the reduction of takes of gas by industrial customers served west of Edgerton." On 21 out of 100 days covered by the emergency order Panhandle delivered more than 285,-000,000 cubic feet, and on some days exceeded 290,000,000 cubic feet. However, in October, 1948, for a number of days the deliveries fell below 270,000,000 cubic feet per day. These figures are taken from Panhandle's records. They support Consolidated's contention that Edgerton had a capacity much over 270,000,000 cubic feet per day and that Panhandle did not on the days listed comply with the Commission's order.

Panhandle contended that Consolidated's motions for discovery upon these questions should be refused because they were not relevant. If we are correct in our conclusion that under the Commission's order of July 17, 1948, firm customers of Panhandle east of Edgerton had a priority over interruptible customers of Panhandle west of Edgerton to the extent of Edgerton's total capacity, then Panhandle's record of interruptible deliveries west of Edgerton for the period involved was directly relevant. The issue was whether Panhandle complied with the order of July 17, 1948. Upon that point the question whether the deficiency was caused or contributed to by Panhandle's diversion of millions of cubic feet of gas per day west of Edgerton to interruptible customers was relevant. As the District Court had jurisdiction of Consolidated's defense stated in Counts IV and VI, judgment as to these counts

must be reversed. For the same reason judgment must be reversed as to the counterclaim. The case must be remanded for new trial on Counts IV and VI and the counterclaim, with direction to consider the actions and defenses pleaded and to consider the motions for discovery and make such order thereunder as is proper in accordance with Rule 34 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The judgment is affirmed as to Counts I, II, III, V and VII and reversed as to Counts IV and VI and as to the counterclaim.

The case is remanded to the District Court for further proceedings in accordance with this opinion.

### Memorandum on Petition for Rehearing

The application for submission of the petition for rehearing to the entire bench is denied. We recently held "that in cases where the appeal was heard, and the judgment or order complained of was decided by a regular Court consisting of three judges only, a petition to rehear or to consider should not be considered by the Court en banc." N.L.R.B. v. Cambria Clay Products Co., 12072, order entered August 12, 1955; Northwest Air Lines, Inc., et al. v. Glenn L. Martin Co., 12130, order entered October 3, 1955.

In the petition for rehearing filed by Panhandle many contentions advanced by Panhandle at the hearing are reiterated. Each of these contentions was given extensive consideration and they will not be discussed here. We adhere to our position that Section 5 of the Natural Gas Act, 15 U.S.C. § 717d(a), 15 U.S.C.A. § 717 d(a), governs these proceedings and that in the absence of the findings required under that paragraph Gd–1 Applicable (c). has no force or effect. This disposes in this court of Counts I, II, III, and V of Panhandle's complaint, and subsidiary questions as to these Counts need not be debated. Neither Mobile Gas Service Corporation v. Federal Power Commission, 3 Cir., 215 F.2d 883 nor Tyler Gas Service Co. v.

United Gas Pipe Line Co., 5 Cir., 217 F.2d 73, involves our precise question and they have no direct bearing.

With reference to Counts IV and VI Panhandle again contends that it is not liable. It says that it was entitled under the Commission's order of July 17, 1948, to decide in its discretion how much gas it would distribute to Gas Storage and Consolidated. It adheres to the position stated in its main brief at the hearing that, after it had delivered to The Ohio Fuel Gas Company, to East Ohio Gas Company, and to its customers east of Edgerton other than Consolidated and Gas Storage the various amounts required by the order, when it divided the balance of gas passing through Edgerton station between Consolidated and Gas Storage in the proper percentages, it had complied with its obligations under the order of July 17, 1948. Panhandle did not say at the hearing, it does not now say in the petition for rehearing, that it delivered gas up to the physical capacity of the Edgerton station. It relies on the fact that the Commission refused an application of the Michigan Public Service Commission to include in its order of July 17, 1948, a provision specifically discontinuing deliveries to Panhandle's interruptible customers. However, the Commission in Opinion 166, which accompanied and laid the basis for the orders of even date therewith, namely, July 17, 1948, declared that the contracts between Panhandle and Gas Storage and between Panhandle and Consolidated were firm contracts and assumed that in its operation Panhandle would give to the deliveries under such firm contracts "the degree of priority appropriate thereto * * *." (Opinion 166, 216 a). It found that "during the present storage season Panhandle's delivery capacity on its system east of Edgerton, after deliveries to its other customers in that area, should then be made available to Consolidated and Gas Storage" in the percentages previously quoted in the opinion. (Opinion 166, 206a). It stated that "a dominant, if not controlling, factor with respect to the supply of gas available from Panhandle's system east of the Edgerton station is the physical capacity of that compressor station." (Opinion 166, 216a). We are cited to no statement of the Commission which indicates that Panhandle was given a discretion as to how much gas should pass through Edgerton. While the Commission did not determine the physical capacity of Edgerton, it found that it was greater than Panhandle's witness testified. The amounts to be delivered were not definite but the measurement was definite. It was to be up to the physical capacity of the station. In light of all the discussion bearing on this point in Opinion 166, we construe the phrase "physical capacity" as meaning the full capacity of the station.

The decision of the Southern District Court of Illinois in Federal Power Commission v. Illinois Power Company and Illinois Commerce Commission, entered October 18, 1948, does not affect our conclusion. While the court stated that Panhandle in its discretion should determine initially when curtailments in interruptible service should be made and the manner and extent thereof, this finding was qualified by the holding that this was "subject to the provisions of the Natural Gas Act and the rules, regulations and orders of the Commission" issued thereunder. (278a, paragraph 15).

Panhandle objects to the opinion because it states as to Counts IV and VI that the deficiencies sued for are "admitted." This statement is correct. Panhandle does not assert that it delivered up to the full capacity of Edgerton station as was ordered by the Commission July 17, 1948. Since the order was to deliver to the full capacity of the station and Panhandle's own records show that this was not done, the deficiencies are admitted.

No evidence of damage was introduced by Consolidated under the counterclaim because it had been dismissed at the time of trial. Panhandle's contention that the reversal of judgment as to the counterclaim is incorrect because the gas

claimed to have been manufactured was manufactured after the period of deficiency deliveries had ended, has no merit. Under the Commission's Opinion 166 Consolidated was specifically authorized to receive and store gas for winter requirements. (201a). The gas received and stored, if insufficient to meet demands of the winter, could be compensated for under Paragraph 4 of Article XVIII of the contract.

The petition for rehearing is denied.